Andrew CAPOROSSI, Plaintiff,

v.

ATLANTIC CITY, NEW JERSEY, a municipal corporation of the State of New Jersey, Lester Warren, Inc., a corporation, of the State of New Jersey, and Mollie Gerber and Shepard Gerber, Defendants.

Civ. A. No. 581–61.

United States District Court
D. New Jersey.

Aug. 7, 1963.

Campbell, Mangini & Foley, by Ralph W. Campbell, Asbury Park, N. J., for plaintiff.

Harry Miller, Atlantic City, N. J., for defendant, Atlantic City.

Arkus & Cooper, by James L. Cooper, Atlantic City, N. J., for defendant, Lester Warren, Inc.

Lloyd, Horn, Megargee & Steedle, by Herbert Horn, Atlantic City, N. J., for defendants, Mollie and Shepard Gerber.

COHEN, District Judge.

This is a motion for judgment notwithstanding verdict,[1] and in the alternative for a new trial,[2] by the defendant, Atlantic City, a municipal corporation of the State of New Jersey, subsequent to a trial by jury and a verdict in favor of the plaintiff, Andrew Caporossi. Appropriate motions during trial were made by this defendant for a directed verdict, or judgment of involuntary dismissal, on all claims for damages asserted by all parties against it, which were denied. In addition to the legal, factual and argumentative bases advanced by defendant at time of trial, which it renews and commingles with its present motion, it urges specifically that the verdict of the jury was contrary to law, and against the weight of the evidence; that the amount of damages awarded was excessive; and that the actions of the court in failing to charge certain requested instructions and in ruling on motions of the codefendants constitute fatal judicial error warranting a new trial.

While many of the reasons assigned by the Court orally, in its disposition of certain motions at time of trial, are equally applicable now, the magnitude as well as the complexity of the legal issues presented and upon which it is compelled to rule as matters of law, requires renewed consideration and enunciation of its conclusions.

This litigation, grounded in tort for personal injury and based upon diversity of citizenship and jurisdictional amount,[3] was instituted by plaintiff, Andrew Caporossi, a citizen of New York, against defendants, the City of Atlantic City, a municipal corporation of the State of New Jersey, Lester Warren, Inc., a New Jersey corporation, which operated the Commodore Hotel in Atlantic City, and

---

1. Fed.R.Civ.P. 50, 28 U.S.C.A. § 2071, properly to set aside the verdict after trial.

2. Fed.R.Civ.P. 59, 28 U.S.C.A.

3. 28 U.S.C. § 1332.

Mollie[4] and Shepard Gerber, citizens of New Jersey, who owned and operated a parking lot in Atlantic City. The plaintiff alleged negligence and nuisance against the defendants who asserted cross-claims among themselves.

At the conclusion of the plaintiff's proofs, and again at the conclusion of the entire case, all defendants moved for judgments of involuntary dismissal and directed verdicts, charging failure of the plaintiff to establish a *prima facie* case against each of them, in that no issue of fact existed for the jury's resolution, and that consequently as a matter of law their motions should have been granted.

On such motions made at the end of the plaintiff's case, it is axiomatic that the trial judge must accept as proof all evidence supporting the position of the plaintiff, and must give him the benefit of all inferences that may logically and legitimately be drawn therefrom.[5] And again where any of the evidence would cause fair-minded men to differ, the issue is one for the jury's determination. Likewise, in passing upon a motion for judgment notwithstanding the verdict, or more properly to set aside the verdict, it should not be granted if the evidence produced at trial was sufficient to present a jury question, or if the verdict is supported by substantial evidence.[6] Whereas, on the motion for a new trial, though similar problems are inovlved, such a motion is addressed to the sound judicial discretion of the trial court, and it may only be granted where, despite substantial evidence, the verdict is clearly against the weight of the evidence, or is based upon evidence which is false, or would result in a miscarriage of justice.[7]

So viewed, and having in mind these salutary principles, the testimony is considered.

On August 24, 1960, the date of the injury herein, and for many years prior thereto, the defendant, Atlantic City, owned, operated, maintained, and controlled a public bathing beach within the confines of the city, bordering on the Atlantic Ocean, to which members of the public were invited. The portion of the beach in question lies at the foot of St. Charles Place between the Garden Pier and the Steel Pier, known as the Delaware Avenue section. This is a highly populated area, serviced by multitudinous hotels, many of which were supplied with pipe lines conveying salt water from the ocean to these hotels providing salt water baths for their guests. In the event of abandonment, fire, or other reasons for disuse, the pipes, referred to throughout the testimony as "dead pipes", were exposed and protruded, above the sand, but below the surface of the ocean, constituting a known dangerous condition and an admitted hazard to bathers.

The Commodore Hotel owned and operated by the defendant, Lester Warren, Inc., is situated on the northerly side of Pacific Avenue, facing St. Charles Place, the broadwalk, and the beach. Gerbers' parking lot, formerly the new Davis Hotel destroyed by fire in 1952 and acquired by them in 1954 after *mesne* conveyances, is located on the easterly side

4. Defendant Mollie Gerber died, *pendente lite*, which fact was noted on the record, and the trial proceeded against defendant, Shepard Gerber, as the surviving tenant by the entirety.

5. Hayden v. Curley, 34 N.J. 420, 422, 169 A.2d 809 (1961); California Fruit Exchange v. Henry, 89 F.Supp. 580, (W.D. Pa.1950); Sattler v. Great Atl. & Pac. Tea Co., 18 F.R.D. 271, (W.D.La.1955).

6. Schrader v. Prudential Ins. Co. of Amer., 280 F.2d 355, (5 Cir. 1960); Shreve v. Hot Shoppes, Inc., 184 F.Supp. 436 (D.C. 1960), aff'd. 110 U.S.App.D.C. 268, 292 F.2d 761; Moffett v. Arabian Am. Oil Co., 85 F.Supp. 174, (D.C.N.Y.1949), aff'd. 184 F.2d 859 (2 Cir.), cert. den. 340 U.S. 948, 71 S.Ct. 533, 95 L.Ed. 683; Weinzen v. Penna. R. Co., 143 F.Supp. 360, (D.C. Pa.1956); Richfield Oil Corp. v. Karseal Corp., 271 F.2d 709, (9 Cir. 1959), cert. den. 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed. 2d 543.

7. Aetna Cas. & Sur. Co. v. Yeatts, 122 F.2d 350, (4 Cir. 1943), citing extensive authorities and cases.

of St. Charles Place, between Pacific Avenue and the boardwalk.

In March, 1944, pursuant to a resolution of the defendant City, a permit was issued to the then owner of the New Davis Hotel, Rose Fleischer, for the installation of salt water intake pipes, leading from the ocean to the said hotel. One terminal of these pipe lines, in disuse since 1952, was located on the beach at· St. Charles Place, and for a considerable period of time prior to the occurrence of August 24, 1960, was exposed, the extent of the exposure varying with the height of the tide; at times completely exposed, at others partially exposed, and at still others completely submerged in the ocean entirely invisible to public bathers. The hazardous condition created by the presence of these pipe lines on the beach was known to the beach personnel and to at least two of the City Commissioners, as well as to many other employees of the City.

The many pipe lines on the beach, and specifically the one in question, resulted in injuries of various kind and degree to lawful bathers almost daily. Such occurrences were reported to and acknowledged by the employees and officials of Atlantic City. Despite these circumstances, these pipes remained without safeguards or other precautionary measures and without any warning signs whatsoever. Recommendations for their removal, prior to the accident, were repeatedly made and as often refused. However, after the incident giving rise to the plaintiff's cause of action, the pipes, belatedly, were removed. Evidence of their removal was proper since control of same was in issue.

Although no charge was made by the City to persons using the beach, luxury taxes were imposed upon hotels and merchants which were passed on to guests and consumers, of $1,797,457.40 for the year 1959, and $1,781,531.07 for 1960, resulting in economic benefit to the City. In furtherance of its endeavors to solicit and attract people to the resort, the City for many years advertised extensively in newspapers, national magazines, on television and radio as far west as Kansas City, up to Canada and down into the South appealing to one-third of the national population to use its beach. The City maintained its own public relations department and employed the services of the Dorland Advertising Agency to whom it paid, in 1959, the sum of $206,587.96 and, in 1960, the sum of $197,243.26.

Shortly prior to August 24, 1960, the plaintiff and his prospective bride, seeking to spend their honeymoon in Atlantic City, communicated with the Commodore Hotel, owned and operated by defendant, Lester Warren, Inc., requesting information concerning its facilities. In response the plaintiff received a brochure, the design of which was authored by the President of the defendant hotel-corporation. The brochure listed "free surf bathing from hotel to beach" as one of its features. It also contained a map of the hotel in relation to the beach, as well as a picture of persons bathing in the surf. The plaintiff sent a money order to the hotel in August, 1960, making reservation for himself and his fiancee, commencing August 23, 1960. After marriage they arrived on August 23, 1960, at 6:00 P.M. and registered at the Commodore Hotel. That evening they attended Steel Pier, an amusement pier situated on the boardwalk abutting the beach. On August 24, 1960, about 4:00 P.M., they prepared to go to the beach; neither had ever been there before, nor were they aware of its site. Upon checking his valuables with the Room Clerk, the plaintiff made inquiry as to the location of the hotel beach and was directed to walk down St. Charles Place, which the plaintiff and his wife proceeded to do. Upon arrival at the beach, they selected a location and placed a blanket on the sands, near a lifeguard stand. Shortly thereafter, the plaintiff and his wife entered the ocean and after a few minutes of splashing at each other playfully, the plaintiff trod into the surf and dove into an incoming wave. His head struck a submerged object. A pool of blood appeared on the water's surface at the site

of the plaintiff's entrance into the surf and at the location of the pipe in question; after calls for help, lifeguards and others ran into the surf, removed the plaintiff therefrom, and summoned medical assistance. The plaintiff sustained severe and permanent injuries to his spine and spinal cord, resulting in quadriplegia.

At the conclusion of the evidence, the motion for dismissal of defendant, Gerber, was granted on the ground that there was insufficient testimony upon which liability in negligence or nuisance could be predicated on either fact or law.[8] The most that was proved was a record easement for the laying of the pipes, which easement was not within 60 years of defendant's chain of title of record. Actual knowledge was categorically denied by the defendant, and remained uncontradicted. The motion of defendant, Lester Warren, Inc., the owner-operator of the Commodore Hotel, was taken under advisement by the Court, and the question of its negligence together with that of defendant, Atlantic City, was submitted to the jury. The jury ultimately returned a verdict for plaintiff in damages in the amount of $600,000.00 against defendant, Atlantic City, and a verdict of no cause for action in favor of defendant, Lester Warren, Inc. Thereafter, the motions of defendant, Lester Warren, Inc., directed to plaintiff's claim and to the cross-claim of defendant, Atlantic City, were granted by the Court.

In contravening the plaintiff's claim for damages for injuries sustained as a proximate result of defendant Atlantic City's negligence in operating a public beach, or on the basis of the maintenance of a nuisance, defendant interposed by pleading and argument of its motion that as a municipal corporation it is immune from tort liability under common law

principles and by statute conferring such immunity, Revised Statutes of New Jersey Title 40:9–2, N.J.S.A., which reads as follows:

> "No municipality or county shall be liable for injury to the person from the use of any public grounds, buildings or structures, any law to the contrary notwithstanding." (L. 1933, c. 460, approved Jan. 10, 1934.)

Defendant concedes that if injury to a person results from the use of "any public grounds, buildings or structures" which is devoted to a proprietary activity, as distinguished from governmental, there is no statutory immunity against municipal tort liability and common law principles apply; but contends that if the function is governmental, then under statutory immunity there is no liability whether the alleged tort is based upon simple negligence, active wrongdoing, or nuisance.

The primary thrust of defendant's argument is that the area involved in this case is that of a "public park", hence within the language of the immunity statute in question, in that it is within "public grounds" therein enumerated. In support of this contention defendant places great reliance upon the character of the land in question, beach front property, as being determined by the nature of its acquisition, conditioned upon its purpose and use as a "public park, or place for public resort and recreation." By its Charter Provisions (P.L.1854 p. 278) the territorial limits of Atlantic City extend into the Atlantic Ocean to the exterior line of the State's riparian jurisdiction. Pursuant to permissive but not mandatory legislative authority, (P.L.1894 c. 93, R.S. 40:179–98 et seq., N.J.S.A.) the defendant, on October 13, 1899, passed a municipal ordinance "to lay out and open a public park or place

---

8. Lambe v. Reardon, 69 N.J.Super. 57, 64, 173 A.2d 520, 525, (App.Div.1961): "A plaintiff does not make out a *prima facie* case against an abutting owner merely by putting in proof of the existence of a nuisance, and he cannot thereby throw upon the owner the burden of establishing that neither he nor his predecessor in title is responsible for its creation or continuance. (citations omitted) On the contrary, plaintiff has the burden of proving that the owner or his predecessor in title was responsible therefor."

for public resort and recreation along the beach or ocean front of Atlantic City, establishing the interior or inland line of such park or place of public resort and recreation, and the limits and boundaries thereof, and providing for the issuing and sale of bonds to defray the costs, damages and expenses incurred in the opening and laying out of such park and acquiring the lands, property and rights necessary therefor, and for the assessment of property benefited thereby." The ordinance further provided for the condemnation of lands desired by the municipality for such public purpose which were not so dedicated by the private owners thereof. To avoid condemnation proceedings by the municipality the then private owner of the beachfront area here in question, now known as St. Charles Place, a James B. Riley, joined with other beachfront owners, and by deed dated February 6, 1900 conveyed to defendant municipality "all their and each of their right, title and interest, in and to the above described tract of land (embracing the area in question) and every part and parcel thereof, including such parts and parcels thereof as are or may be covered by water." There was reserved to the grantors, their heirs and assigns, the right to lay beneath the surface of their respective lands so conveyed, a pipe or pipes from their remaining and adjoining lands to and into the ocean for the purpose of obtaining and conveying sea water to their lands.

Thereafter, and pursuant to the Act of April 8, 1903 which was a supplement to the Act of April 11, 1864, Laws 1903, p. 387, defendant on February 13, 1907 secured a riparian grant from the State of New Jersey Riparian Commissioners, for lands under water lying between the highwater line of the westerly shore of Absecon Inlet and the exterior lines established by the Riparian Commissioners, and for lands under water lying between the highwater line of the Atlantic Ocean and the exterior line as established by the Commission, which included the area in question. This riparian grant was made expressly subject to a prior grant

by the State of New Jersey, through its Riparian Commissioners, to the United States of America on August 17, 1878. Further, the grant to the municipality provided that should public purpose cease, the lands were to revert to the State.

Such then was the title of defendant, Atlantic City, when in 1944 it issued a permit for the laying of salt water intake pipes to Gerbers' predecessor in title, pursuant to a "Resolution" of its Board of Commissioners, which resolution provided, *inter alia,* for the laying of pipes and intakes at sufficient depth under the sands of the "public park" so that neither pipe nor intakes shall protrude above the beach; that the permittee was to assume sole responsibility for damage to street construction or to the public using the beach caused by the same becoming uncovered on the beach; and that such permittee was to post bond to assure all repairs, and to lower the pipe line when such were necessary "to protect the public property and people using the beach." No grant of easement of record was ever properly lodged to give notice of such resolution or construction permit which would appear upon a search of the title to the lands in question.

Defendant, Atlantic City, strenuously argues that the Court departed from the obligatory duty imposed upon it by the Federal Rules of Decision Act (28 U.S.C. § 1652), as interpreted by Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487 (1938), and by subsequent United States Supreme Court decisions, in holding that the city in its operation of "the beach park" was engaged in a proprietary function, and in refusing to base its determination of the substantive law of New Jersey on the decisions of the New Jersey Court of last resort, as then constituted, in Bisbing v. Asbury Park, 80 N.J.L. 416, 78 A. 196, 33 L.R.A.,N.S., 523 (E. & A.1910), and Kuchler v. New Jersey & N. Y. R. R. Co., 104 N. J. L. 333, 140 A. 329 (E. & A. 1928), which cases it contends hold that the operation of a "public park" is a governmental function.

■ The legal compulsion to apply state substantive law under the Federal Rules of Decision Act [9], and as developed by the United States Supreme Court since Erie, is well established in diversity actions in the Federal District Courts.[10] In such actions, as here, the Federal District Court is but another forum of the state courts and is compelled to make such determination as would a state court on the precise issue presented to it.[11] Its function is not to speculate as what the law will be in the future, or apply a rule of law which it considers better or wiser.[12] And conversely, the Federal District Court in a diversity case must accept a binding ruling of the state court of last resort, or lacking such, its intermediate appellate courts, even though in its opinion it is an erroneous one.[13] As was stated in West v. Amer. Telephone & Telegraph Co. (1940), 311 U.S. 223 at pp. 236, 237, 61 S.Ct. 179 at p. 183:

"True, as was intimated in the Erie Railroad case, the highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted. * * But the obvious purpose of § 34 of the Judiciary Act is to avoid the maintenance within a state of two divergent or conflicting systems of law, one to be applied in the state courts, the other to be availed of in the federal courts, only in case of diversity of citizenship. That object would be thwarted if the federal courts were free to choose their own rules of decision whenever the highest court of the state has not spoken.

"A state is not without law save as its highest court has declared it. There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them. In those circumstances a federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court, even though it thinks the rule is unsound in principle or that another is preferable. State law is to be applied in the federal [court] as well as the state courts and it is the duty of the former in every case to ascertain from all the available data what the state law is and apply it rather than to prescribe a different rule, however superior it may appear from the viewpoint of 'general law' and however much the state rule may have departed from prior decisions of the federal courts."

9. 28 U.S.C. § 1652: "The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." June 25, 1948, c. 646, 62 Stat. 944. Based on Title 28 U.S.C. 1940 ed., sec. 725 (R.S. sec. 721); Judiciary Act of 1789, sec. 34.

10. Nolan v. Transocean Air Lines, 365 U.S. 293, 81 S.Ct. 555, 556, 5 L.Ed.2d 571, 572 (1961); King v. Order of etc. Travelers, 333 U.S. 153, 68 S.Ct. 488, 92 L.Ed. 608 (1948), and see notes (12) and (13) post.

11. Hausman v. Buckly, 299 F.2d 696, (2 Cir., 1962), cert. den. 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286.

12. West v. Amer. Telephone & Telegraph Co., 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940).

13. Montgomery Ward & Co. v. Morris, 273 F.2d 452, (8 Cir., 1960); Hausman v. Buckly, ante; West v. Amer. Telephone & Telegraph Co., ante; Six Companies of California v. Highway Dist., 311 U.S. 180, 61 S.Ct. 186, 85 L.Ed. 114 (1940); Fidelity Union Trust Co. v. Field, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109 (1940).

In any consideration of the effect of the immunity statute upon the state of the law, which must bind and guide a court called upon to make a determination of the existence of municipal liability or immunity in tort law, resort must be made, of necessity, to the original historical development of the substantive law of New Jersey in order to ascertain the present law to be applied in the particular case.

██ At the outset it should be understood that although the statute imports to grant blanket immunity to municipalities in its operation of public buildings, lands, etc., the New Jersey courts have interpreted this immunity to apply only when a governmental function is being performed on the premises in question.

Thus, we are confronted with the query of whether the ownership and maintenance or operation by the municipality of the public bathing beach in Atlantic City, bordering on the Atlantic Ocean, was activity within the classification of governmental capacity and function, for the purpose of determining immunity or non-immunity in tort law.[14]

The historical inception of the municipal immunity problem is stated in McAndrew v. Mularchuk, 33 N.J. 172, 190–191, 162 A.2d 820, 830, 88 A.L.R.2d 1313 (1960):

"The general thesis of municipal immunity traces back to the 1788 English case of Russell v. The Men of Devon, 2 Term.Rep. 667, 100 Eng. Rep. 359 (K.B.1788). At that time 'the idea of the municipal corporate entity was in a nebulous state and the action was in effect against the population of a whole county.' The decision was predicated on lack of precedent to sustain the action, fear of a multitude of such actions and the absence of funds in the treasury to be used in payment of judgments arising out of tort claims. (Citation of authorities omitted). In such a situation Judge Ashurst, speaking for the Kings Bench in Russell, said, 'that it is better that an individual should sustain an injury than that the public should suffer an inconvenience.' 100 Eng. Rep. at p. 362. How the courts of the United States came to apply the sovereign immunity doctrine, according to Professor Borchard, 'is one of the mysteries of legal evolution.'" (See 15 Rut.L.Rev. 98 (1960) note; discussed, 86 N.J.L.J. 1 (1963).

Prior to the immunity statute of 1934, "governmental tort immunity" in New Jersey enunciated in Board of Chosen Freeholders of Sussex County v. Strader, 18 N.J.L. 108 (Sup.Ct.1840) had been rarified by decisions of its courts of last resort to a point where the legal classification of the municipal activity involved

---

14. The origin of the doctrine of governmental immunity is steeped in the early history of England on the rudimentary theory that "the King can do no wrong." The balancing of the concept of such sovereign immunity against the right of the injured individual gave rise in judicial decisions to artificial distinctions, such as governmental and proprietary functions, in order that a wrong should not be without judicial remedy. Such cases seem irreconcilable on the basis of the various reasons and tests assigned to determine the one classification or the other. Municipal Corp. 38 Am.Jur. 573, 574, pp. 266, 267; 63 C.J.S. Municipal Corporations §§ 747–750, pp. 34–38; Nissen v. Redelack, 246 Minn. 83, 74 N.W.2d 300, 55 A.L.R.2d 1428 (1955) annoted p. 1434; under the topic "Municipal operation of bathing beach or swimming pool as governmental or proprietary function for purposes of tort liability"; Prosser, the Law of Torts (2d ed. 1955) sec. 109; 2 Harper and James, the Law of Torts (1956) sec. 296; 3 McQuillin, Municipal Corporations (3d ed. 1950) sec. 53.29; Doddridge, Distinction Between Governmental and Proprietary Functions of Municipal Corporations, 23 Mich.L.Rev. 325 (1925). In the present day, particular and new activities of municipal corporations give rise to further distinctions, e. g. "Parks, Playgrounds, Public Squares, and Commons," 63 C.J.S. Municipal Corporations § 907; "Public Baths, Beaches and Swimming Pools," 63 C.J.S. Municipal Corporations § 908, p. 322; further authorities collected, 60 A. L.R.2d 1199 nn. 1–6.

was either governmental or proprietary with alternate liability or freedom in the field of tort law.[15]

Of course, the difficulty in determining the one classification or the other plagued the courts. See: Weintraub and Conford, Tort Liability of Municipalities in New Jersey, 3 Mercer Beasley L.Rev. 142, (1934).

The precise effect of the statute upon municipal liability was considered by the lower courts in New Jersey, shortly after its enactment, in Leeds v. Atlantic City, 13 N.J.Misc. 868, 181 A. 892 (Cir.Ct. 1935), and in Falcone v. Newark Board of Education, 17 N.J.Misc. 75, 4 A.2d 687 (C.P.1939).[16]

In Leeds, the court pointed out that it could be presumed that the Legislature was mindful of the distinction between governmental and proprietary functions in the New Jersey decisional law when it enacted the statute in question, and that had a drastic change in the law been intended, such would have been manifest in the language of the statute. It found no such drastic change, and concluded that Atlantic City's ownership and operation of Convention Hall, where plaintiff was injured while a paying patron at a football game, was similar in nature to a private enterprise, hence proprietary in nature rather than governmental and, consequently, not within the statute which would absolve it from liability for negligence.

In Falcone, the court was confronted with a case where a child was injured at school by a falling slate slab. It referred to the two exceptions to the general common law rule of non-liability of governmental bodies for negligence—active wrongdoing and proprietary function. The court declared that the statute

in question was intended to modify the common law rule, but that the courts have carefully construed and applied the statute so as not to overrule unnecessarily the common law principles, pointing out that the statute concerns "public grounds, buildings or structures," and hence, public streets and public ways, and proprietary activities, as distinguished from governmental, are not within the protection of the statute.

Judge Goldmann, in Weeks v. City of Newark, 62 N.J.Super. 166, 171–172, 162 A.2d 314, 317 (App.Div.1960), provided scholarly review and brilliant analysis of the law in New Jersey pertaining to the municipal immunity problem, stating:

"Various courts have considered the statute subsequent to the Leeds and Falcone decisions. However, the precise effect of the statute upon the common law classification of municipal and county activities as governmental or proprietary has never been expressly declared by our court of last resort."

Judge Goldmann goes on to point out that cases presented to the Supreme Court of New Jersey are not such as to call forth any definitive declaration short of implying that common law distinction of governmental or proprietary functions persists as part of New Jersey law.

In Weeks the Court found that the municipality had engaged in a proprietary function, and hence, if negligent, was not protected by the immunity statute. The function was the operation of a swimming pool, the Hayes Park Pool West, by the municipality, the City of Newark, where plaintiff was injured. It was held to be an activity not necessarily nor historically incident to government,

15. Schwartz v. Stockton, 32 N.J. 141, 160 A.2d 1, (1960), a learned opinion by Justice Hall, for the New Jersey Supreme Court, citing extensive authority; cf: Thompson v. Millville Bd. of Ed., 11 N. J. 207, 94 A.2d 206 (1953); Cloyes v. Delaware Twp., 23 N.J. 324, 129 A.2d 1, 57 A.L.R.2d 1327 (1957).

16. The 1933 enactment, effective in 1934, R.S. 40:9–2, N.J.S.A., applied to school districts as well as municipalities and counties, and with the 1937 revision of the New Jersey Statutes, the statute was parceled into "Education" (R.S. 18:5–30, N.J.S.A.), and the statute here in question, "Municipalities and Counties", R.S. 40:9–2, N.J.S.A.

but rather susceptible of, and usually exercised by, private enterprise.

With respect to the operation of a swimming pool by a municipality, the Court in Weeks observed that there are two general views reflected by the case law on the subject: (1) The majority or Massachusetts doctrine, on the question of immunity where a swimming pool is maintained and where nominal charge only may be made, proceeding generally on the ground that maintenance of a swimming pool is in the interest of the public health and welfare, hence, governmental; and (2) that of a strong minority known as the New York line of decisions, holding proprietary-non-immunity, on the ground that the modern trend is against municipal non-liability, and although the public health might incidentally be benefited, it should be realized that a municipality that operates a swimming pool is acting as a legal individual voluntarily assuming a duty, not imposed upon it as a necessary and essential incident of government for the benefit of a locality rather than the general public.[17]

On appeal, Weeks was affirmed unanimously by the Supreme Court of New Jersey, *per curiam*. This convincingly demonstrates the Court's gauging of the development of the law on the problem before it, as well as the discernment of the judicial temper of the court of last resort in the State of New Jersey.

Those courts which classify these facilities as governmental do so usually on the ground that they have intimate relation with the public health or, more broadly, with the public good. Such is the rationale of the two cases stressed by the defendant, Bisbing v. Asbury Park, supra, and Kuchler v. New Jersey & N. Y. R. R. Co., supra. The opinion in Bisbing is seemingly based, to some extent, on the criterion that "neither the grass plot (where the accident occurred), nor the way upon which it bordered, produced revenue to the City"; and further, that the land in question was a "park site" held for public purpose in governmental capacity, and therefore immune under Strader. The theory of corporate benefit as the sole proprietary test has since Bisbing been rejected in New Jersey.[18] In Kuchler it was determined that a municipality which leased from a railroad company a plot of ground maintained by it as a park immediately above the station was not liable for injury occurring as a result of ice on steps leading from the park to the station. The Court stated that "the maintenance of public parks is a recognized method of serving the public interest, and nothing in the instant case is presented to differentiate it as an exception from the application of this well-settled rule," relying for authority on Bisbing.

In "Tort Liability of Municipalities in New Jersey", supra, the "abundant crop" of decisions referred to by Chief Justice Hornblower in Freeholders of Sussex v. Strader, supra, ensued in passing years, as municipal activity expanded with changing times and became more com-

---

17. See generally, 55 A.L.R.2d 1434, anno. "Municipal operation of bathing beach or swimming pool as governmental or proprietary function, for purposes of tort liability"; 51 A.L.R. 370, suppl. 57 A.L.R. 406, 8 A.L.R.2d pp. 1310, 1315 and 1317; also, "Liability of municipal corporations for injuries due to conditions in parks," 29 A.L.R. 863, supplemental in 42 A.L.R. 263, 99 A.L.R. 686, 142 A.L.R. 1340, 60 A.L.R.2d 1204, sec. 4(b).

18. See Weeks v. Newark, supra; Housing Authority v. Trust Co., 25 N.J. 330, 136 A.2d 401 (1957). Cf.: Hoffman v. Bristol, 113 Conn. 386, 155 A. 499, 75 A.L.R. 1191 (1931), where although recognizing the operation of a nonprofit public bathing beach as a governmental function to which immunity attached, following the Massachusetts view, the municipality was held liable on the basis of nuisance for maintaining a diving board above shallow water. Note that while Massachusetts represents the majority view holding municipal beaches a governmental function, it also provides an interesting paradox: Cape Cod, a peninsula beached on three sides by the Atlantic Ocean, and comprised of approximately 68 small villages, consists principally of private beaches, and it would appear that the problem of municipal liability would seldom, if ever, arise.

plex. The article reviews the decisions of the New Jersey Courts up to May of 1934. Present day problems were there anticipated by the authors of the landmark treatise, and to some extent resolved a quarter of a century later. In Cloyes v. Delaware Twp., the Supreme Court, then speaking through Justice Weintraub (now Chief Justice and one of the authors of the treatise) in 23 N.J. 324, 332, 129 A.2d 1, 5, 57 A.L.R.2d 1327 (1957), said:

"We do not believe this is the case in which to consider whether to come to grips with the entire problem. We are satisfied that movement toward Strader is in the wrong direction. Hence we confine the inquiry to the question of whether the operation here conducted is proprietary within the holding of more recent authorities, without regard to whether the result will jell with expressions which antedate them."

This then is the posture of the New Jersey law on this issue. There are no New Jersey cases which endow municipally owned public beaches or public parks with proprietary characteristics. The next logical query involves the legal compulsion of this Court to apply the substantive holding of Kuchler which relies on Bisbing which, in turn, relies on Strader.

Although there must be faithful adherence to state substantive law in nonfederal matters it should be a wise and discerning loyalty. Blind adherence to certain state decisions i. e., Strader, Bisbing and Kuchler, without evaluating those decisions in the light of other more recent and more relevant judicial developments would result in injustice and a perversion of the state law which a federal court sets out to apply.[19] The then understandable fear, assigned as a basis in Strader, for insulation against municipal liability—a pernicious dissipation of public funds—has become a myth under the conditions of a modern enlightened society. Like gaslight of another time it must give way to the brightened illumination of today, which chases the shadows and leaves exposed the inadequacy of such a Mid-Victorian concept.

The governmental-proprietary dichotomy is probably one of the most unsatisfactory known to the law. In 1955 a majority of five Justices of the United States Supreme Court spoke of "* * * the 'non-governmental'—'governmental' quagmire that has long plagued the law of municipal corporations. A comparative study of the cases in the forty-eight States will disclose an irreconcilable conflict. More than that, the decisions in each of the States are disharmonious and disclose the inevitable chaos when courts try to apply a rule of law that is inherently unsound." Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

In Bernhardt v. Polygraphic Company of America, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956), a relaxing of the strict rule was suggested. Faced in a diversity case with a question apparently settled by a 1910 decision of a state Supreme Court, it felt bound by that decision. The Court, however, noted:

"* * * it was agreed on oral argument that there is no later authority from the Vermont courts, that no fracture in the rules announced in those cases has appeared in subsequent rulings or dicta, and that no legislative movement is under way in Vermont to change the result of those cases.

"* * * [T]here appears to be no confusion in the Vermont decisions, no developing line of authorities that casts a shadow over the established ones, no dicta, doubts or ambiguities in the opinions of Vermont judges on the question, no legislative development that promises to undermine the judicial rule."

In a concurring opinion, Mr. Justice Frankfurter suggested that a federal court might decide that the Vermont

19. See Fahs v. Martin, 224 F.2d 387 (5 Cir. 1955); See 1 A Moore Fed. Pract. (1961) 0.309.

court, if faced with the question at this time, might reach a conclusion contrary to the 1910 decision. He argued, quite forcefully, that the court should attempt to decide what the Vermont court would do with the question now.

The task, therefore, is to determine whether subsequent to Bisbing and Kuchler, there is judicial persuasion to convince this Court how the highest New Jersey State Court would decide this question.[20] The Supreme Court in New Jersey has spoken out repeatedly against the amplification of the doctrine of immunity from tort liability, despite a general legislative unwillingness to act in light of present day circumstances, and despite the reluctance of the majority of courts of other states to break with outmoded doctrines of the past. In McCabe v. N. J. Turnpike Auth., 35 N.J. 26, 170 A.2d 810, (1961), the Court found sufficient manifestation of legislative intent to subject the Turnpike Authority to suit, without resorting to the troublesome distinction of governmental or proprietary activity for negligently inflicted

20. An examination of 50 years of judicial history of Bisbing v. Asbury Park, 80 N. J.L. 416, 78 A. 196, (E. & A. 1910) anno. 33 L.R.A.,N.S., 523, discloses that it has been cited by the appellate courts of New Jersey only as companion authority with and since Strader (1840), supra, for the general principle that a municipality is not liable in negligence in the performance of its governmental duties, with certain exceptions such as proprietary functions and active wrongdoing; c. g., Karpinski v. Borough of South River, 85 N. J.L. 208, 88 A. 1073 (E. & A. 1913) where child injured by electric wire on street, the municipality supplying electric service to private consumers; Stephens v. Commissioners of Palisades Interstate Park, 93 N.J.L. 500, 108 A. 645 (E. & A. 1919), a case involving a broader concept—the defendant interstate (N. J. and N.Y.) Commission was directly created by statute and held to be within the rule in Strader, supra, of a public agency charged with a public duty and therefore absolved from negligence; Johnson v. Bd. of Ed. of N. Wildwood, 102 N.J.L. 606, 133 A. 301 (E. & A. 1926), injury in school building, followed Strader, supra; Kuchler v. New Jersey & N. Y. R. Co., infra; Liming v. Holman, 10 N.J.Misc. 582, 160 A. 32 (Sup.Ct. 1932), involved injury to a jail attendant by escapee, and relied on the general rule of public duty; Martin v. Asbury Park, (2 cases) infra; Com'r. Int. Rev. v. Sherman, 69 F.2d 759 (1 Cir. 1934), involved question of exemption from tax of employee engaged in governmental function (now obsolete), but it states the Massachusetts view on parks, citing Bisbing with approval, but makes distinction in kind between parks created as part of a general statutory park system, and "pleasure resorts"; Doerr v. Newark, 128 N.J.L. 491, 27 A.2d 198 (Sup.Ct.

1942), alleging injury from a fall in City Hall where plaintiff went to pay water bill, pointing out site of fall not clear, and she might have cause of action if in water department; Miller v. Layton, 132 N.J.L. 426, 41 A.2d 23, 24 (Sup.Ct. 1945), a bridge damage case much like Strader, upon which court relied; Hill v. Borough of Collingswood, 9 N.J. 369, 88 A.2d 506 (1952) pertained to a Park Commission, not unlike Palisades, ante, but there the park was part of a County Park System created by statute, R.S. 40:37-17, 18, N.J.S.A. as automonous agency, and its general governmental function could not be thwarted by local zoning ordinance. And within the 35 years since Kuchler v. New Jersey & N. Y. R. Co., 104 N.J.L. 333, 140 A. 329 (E. & A. 1928), the New Jersey courts have cited it in opinions only twice. See: Kelley v. Curtiss, 29 N.J.Super. 291, 297, 102 A.2d 471, 473 (App.Div.1954), reversed on other grounds, 16 N.J. 265, 108 A.2d 431 (1954), Stringfield v. City of Hackensack, 68 N.J.Super. 38, 43, 171 A.2d 361, 364 (App.Div.1961) a municipal parking case, which merely alludes to it. Neither of these intermediate appellate cases relied upon Kuchler as controlling authority. Furthermore, in Kuchler, the site of injury was on steps *leading* to a park site leased from the railroad company.

A review of the New Jersey decisions of the past 35 years clearly demonstrates a more realistic attitude in the tort field towards the proprietary classification in refusing to extend an ancient, inflexible, and often harsh, and modernly unnecessary doctrine of immunity to new situations. "This New Jersey trend is in line with that being followed elsewhere." Schwartz v. Stockton, 32 N.J. 141, 147, 160 A.2d 1, 4 (1960).

wrongs, pointing out that "Critical writers have made it clear that the doctrine of sovereign immunity has little relevancy to modern day concepts of justice." [21] As was stated by the Court in both McCabe and Cloyes, the doctrine of municipal immunity developed for a society totally unlike the present day one, and should not be further burdened with " 'hairline distinctions' which are 'elusive and unsatisfactory' and often most artificial." And, as emphasized in Cloyes, any attempted explanation for judicial inconsistency can be found only in the history of the subject and the evolutionary development of that area of law as particular cases called for disposition in light of changing times, extended municipal activities, and progressive concepts of remedial justice in the field of tort liability. The underlying reason for the granting of immunity to municipal corporations was the practical concern of the courts to avoid the supposed inevitable flood of negligence actions, or, as stated in the Strader case, the "abundant crop." [22]

Comparisons, while not controlling of course, provide greater dimension to the concepts being considered. A factually analogous situation arose in Ide v. St. Cloud, 150 Fla. 806, 8 So.2d 924, noted in 8 A.L.R.2d 1317 (1942), where a city pursuant to charter power, maintained a public bathing beach to which the general public was invited. For some time, it had knowingly allowed a deep hole there to remain hidden and unguarded. Plaintiff's deceased husband and son were drowned. It was held that the complaint stated a cause of action. More than 40 years ago, Florida, a state equally famous, if not more so, for its public beaches as New Jersey, recognized municipal liability in tort to innocent victims of misfortune. In Kaufmann v. Tallahassee, 84 Fla. 634, 94 So. 697, 30 A.L.R. 471

(1922), it repudiated entirely the governmental-proprietary distinction with its judicially evolved "quagmire" of legal fictions and logistical niceties. The Florida court espoused the view that antiquated concepts were inapplicable to modern cities operating as municipal corporations under a commission or city manager form of government for the reason that in modern times the activities of such cities " * * * partake more of the nature of business than government." The court concluded further, that all such functions of municipal corporations would be considered proprietary, in the exercise of which, there would be liability for the negligence of its officers and agents. Thirty-five years after Kaufmann, in Hargrove v. Town of Coca Beach, 96 So.2d 130, 60 A.L.R.2d 1193 (Fla.Sup.Ct.1957), the court swept aside the basic immunity rule and established the principle of vicarious liability for both active and passive negligence under the doctrine of *respondeat superior*. Some of the language is particularly edifying, 96 So.2d 130, at pages 132–133, 60 A.L.R.2d 1193, at pages 1196–1197:

"The problem in Florida has become more confusing because of an effort to prune and pare the rule of immunity rather than to uproot it bodily and lay it aside as we should any other archaic and outmoded concept. * * * that the time has arrived to face this matter squarely in the interest of justice and place the responsibility for wrongs where it should be. In doing this we are thoroughly cognizant that some may contend that we are failing to remain blindly loyal to the doctrine of stare decisis. However, we must recognize that the law is not static. The great body of our laws is the product of progressive thinking which attunes traditional concepts to the

21. See Taylor v. N. J. Highway Authority, 22 N.J. 454, 126 A.2d 313, 62 A.L.R.2d 1211 (1956). There Justice Jacobs observes that federal decisions persuasively point out that the doctrine of governmental immunity from suit is currently in disfavor.

22. Vide: 3 Mercer Beasley L.Rev. 142, op. cite.

needs and demands of changing times. The modern city is in substantial measure a large business institution. While it enjoys many of the basic powers of government, it nonetheless is an incorporated organization which exercises those powers primarily for the benefit of the people within the municipal limits who enjoy the services rendered pursuant to the powers. To continue to endow this type of organization with sovereign divinity appears to us to predicate the law of the Twentieth Century upon an Eighteenth Century anachronism. Judicial consistency loses its virtue when it is degraded by the vice of injustice."

In like manner, the Supreme Court of New Mexico abandoned old legal frontiers in the case of Barker v. City of Santa Fe, 47 N.M. 85, 136 P.2d 480, 482, (Sup.Ct.1943):

"It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, 'the King can do no wrong', should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury, rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs."

Both Kaufmann and Barker were adopted with approval by the Supreme Court of New Jersey in McAndrew, supra, observing that Illinois had done likewise for the same reasons in Molitor v. Kaneland Community Unit District, No. 302, 18 Ill.2d 11, 163 N.E.2d 89, 86 A.L.R.2d 469 (1959).

■ When viewed against the panorama of legal history, it seems inevitable that even with quickened enlightenment, responsive changes came more slowly and often with tedious caution. This seems especially true in regard to anciently venerated legal postulates which justify their continued existence on the pragmatic needs of remote times and outmoded conditions rooted in ritualistic adherence to the doctrine of *stare decisis*. *Stare decisis*, while a valuable and well established doctrine, should serve as a flexible channel marker for guidance and not as an immovable sand bar which may cause disaster; it should not be permitted to foreclose re-analysis and re-evaluation of legal postulates, which may well have lost their vitalizing principle. If outmoded and artificial distinctions are to persist in confining a court of law to a choice of specific alternatives, one of which provides remedy for an injured individual, and the other does not, then the choice of remedy seems clear as the demands of justice must be obliged in each particular case.

As was eloquently stated by Mr. Justice Holmes, commenting on "The Path of the Law", in Collected Legal Papers, Oliver Wendell Holmes, p. 187:

"It is revolting to have no better reason for a rule of law than it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since and the rule simply persists from blind limitation of the past."

It seems axiomatic that when the reason for a rule or principle falls, so too the rule or principle. Justice Weintraub advanced this very rationale in Cloyes, 23 N.J. 324, 328, 129 A.2d 1, 3, stating:

"At a time when municipal activities were few and the capacity of municipalities to respond in damages was uncertain, the doctrine of the Strader case undoubtedly seemed to be the common sense answer to the problem. But when municipalities and other governmental agencies expanded into new areas, either replac-

ing private entrepreneurs or meeting new needs which theretofore had not required public activity, additional factors had to be weighed. The expansion of the area of operations enlarged the area of hurt. The number of private injuries which would go without remedy necessarily increased. The experience of private operators who performed subject to the ordinary principles of tort liability had demonstrated that such operations could absorb the impact of liability for negligence without curtailing or imperiling the service, and hence the fear of a crushing impact upon public funds which played a role in the Strader [case] was allayed. * * * The advent of liability insurance increased confidence in the ability of local government to carry on without special immunity. And, lastly, concepts of fair play and justice changed. The notion that a remedy by indictment could satisfy the public interest became archaic. It could not be adjusted to new thinking, the view that society is better served by absorbing the misfortunes negligently inflicted upon individuals rather than by leaving them to their own inadequate devices for the supposed benefit of the entire community."

Such lucid language of the Chief Justice seems particularly appropos to the matter now calling for resolution. The inquiry here is not one which seeks to impose undue hardship on a municipal corporation or confront it with absolute liability in the field of negligence, but rather to determine whether its conduct and activity are such as to call upon it, as with any other tortfeasor, to answer in liability on ordinary principles of negligence, where it voluntarily assumes to act in a proprietary capacity not necessarily incident and essential to its fundamental essence as a governmental body politic.

The foregoing decisions of the New Jersey courts, while not precisely disposi- tive of the issue here, provide the controlling rationale for determination and offer ample criteria in light of the current development of its law governing municipal liability in negligence.

With respect to the specific activities of defendant, Atlantic City, in regard to the public bathing beach in question, the following operations appear from the evidence and stand uncontradicted or explained away by the defendant:

(a) The extensive efforts of defendant to induce, attract and invite persons generally, of which plaintiff was one, to come to its City and use its facilities, foremost of which was the beach and ocean bathing. It employed widespread national advertising for this purpose, at a cost of several hundred thousands of dollars annually.

(b) It imposes a system of "luxury taxes" for the raising of revenue for the municipal corporation, which taxes are passed on to all consumers and guests for the use of its facilities, realizing approximately $1\frac{3}{4}$ million dollars annually, without which the City, according to the testimony of its Director of Revenue and Finance, would be "bankrupt". Some portion of such revenue was used to maintain and operate the beach in question; a sum over $200,000 annually.

(c) It fostered and provided by way of concessions on its boardwalk abutting its beach, snack bars, restaurants, rolling chairs, rest stations, rest pavilions, bath houses, and other public incidents of commerce; and on its beach, beach chairs, cabanas, umbrellas, pony rides, horseback riding, rest stations, from all of which it collected mercantile revenue.

(d) It provided a complete unit of Beach Patrol Police; so-called "protected beaches" by the stationing of lifeguard stands and a trained lifeguard patrol with ranking officers, having care of the beach, the foreshore, and the ocean, with the use of life-saving equipment, such as boats, rafts, surf boards, respirators, life preservers and the like.

(e) It provided a trained unit of beach personnel for the physical maintenance,

care and cleaning of the beach surface, with appropriate supervisory personnel for inspections, such as the Captains of the Beach Patrol and the Commissioner of Public Safety

(f) It provided medical stations, with physicians and trained personnel, for injuries sustained by bathers and other users of the beach area, which medical stations and personnel maintained a record of mishaps, injuries and medical assistance rendered, all of which were reported to appropriate municipal officers.

In Weeks, a public swimming pool was involved; in the instant case, a public bathing beach. In Weeks, the municipality exercised complete dominion and control of the public park swimming pool; likewise here; in both cases the respective municipalities derived revenue; in both cases the municipalities provided facility to the public, and there was no discrimination against individual citizens or members of the public generally.

In the instant case the defendant municipality did not preempt any right of the sovereign State of New Jersey to operate the beach; it did not share the benefits or burdens with the State; it did not operate the public beach in question under and subject to the control or supervision of the State or as its agent or *alter ego;* it did not seek or employ any participation by the State as a necessary or desirable adjunct to its operation. On the contrary, the defendant municipality for the length and course of a great many years, assumed complete and exclusive dominion and control of the beach shore in question, and engaged in its operation and management to an extent manifestly commensurate with sole proprietorship.

Atlantic City fostered and sponsored a great influx of tourists to use its facilities; it was literally in the business of promoting tourists and their use of its attractions of entertainment and recreation; it is internationally characterized by itself, and others, as the "Playground of the World"; it has also become known as the "Convention City", as the city of "Miss America", of the beauty pageants,

and recently the successful bidder for the Democratic National Convention at an estimated $650,000.00. Atlantic City's bare naive assertion that it was merely paternally and altruistically engaged in government in providing public park facilities for the well-being of its citizens, surrounding communities, the people of the State of New Jersey, of the nation and the world at large, in the face of its incurring of great expense, a full-time promotional endeavor, the reaping of substantial revenues and benefits, all without legitimately selfish proprietary interests and rewards, is at best unrealistic.

Thus, it is difficult to conclude, that, as a matter of law, defendant municipal corporation was performing time-honored, customary and characteristic employments of a political governmental body charged with the collective good and welfare of its citizens, as with an isolated park-site where inhabitants seek health, rest and fresh air in an environment of trees, fountains, ponds, streams, knolls, footpaths, and the like, as anciently of the "Walden" of Henry Thoreau, and modernly generally associated with "parks"; or as with the quietude of a public library for research, study or contemplation. Rather, it engaged on a grand scale in the commerce of services and facilities unknown in earlier times when common law immunity in negligence cases arose. Indeed, it would be most difficult to conceive a private entrepreneur, and enterprise, which could so amply commercialize and exploit a natural resource, or resort, to such extent as to render certain municipal services as police and fire protection, streets and highways, welfare agencies, and the like, as merely a corollary to big business. That the defendant, Atlantic City, was engaged in a proprietary activity, as distinguished from a governmental function, in light of all the foregoing considerations, seems not only well founded in fact and logic, but is compelling for acceptance as a matter of law, with respect to its obligation to answer in negligence as a private proprietor similarly so engaged.

The Bisbing case, and Kuchler which relies upon it for authority, are not controlling in the instant case. In Bisbing, the court was steeped in the legal philosophy of Strader, which it cited as its major premise; it merely alluded to "private capacity" now well known in the decisions of New Jersey as "proprietary capacity". The court concluded that the use of the land there in question was governmental. Bisbing does not stand for the proposition, as contended by defendant, that public lands, or a public park, or some portion thereof, cannot under any circumstances be devoted to a proprietary use. Kuchler provides no greater persuasion for such contention. These cases have been significantly left behind in the development of the law of New Jersey regarding municipal tort liability, as pointed out in Cloyes, and are clearly distinguishable both in fact and law. The crystallization of the substantive law of New Jersey in the past 50 years cannot be disregarded and resort made to earlier expressions alone, not precisely dispositive of a current issue of law. Such is the very folly interdicted by Justice (now Chief Justice) Weintraub in Cloyes. Rather it is this crystallization of the substantive law of New Jersey, as reflected in its judicial decisions of binding persuasion and compelling legal force, that has guided this Court to the applicable criteria and to its ultimate decision. As once said by Mr. Justice Holmes:

"The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics. In order to know what it is we must know what it has been and what it tends to become."

█ That a municipal corporation may act in many spheres and, in legal contemplation, be classified for particular purposes, is a matter of common experience.[23] A determination here, for the purposes of tort liability, that the maintenance and operation of the beach and bathing facilities incident thereto, by the defendant municipality, was in the nature of a proprietary activity, does not defeat, work a forfeiture or reversion, or occasion any violence to any restrictive covenant, grant, or deed of dedication limiting or circumscribing municipal purposes as "public park or place for public resort and recreation." Public purpose persists, although a particular use devoted to the public at large may be proprietary, as distinguished from governmental. In Martin v. City of Asbury Park, 111 N.J.L. 364, 168 A. 612, (E. & A.1933), opinion by Chancellor Campbell, the City was held as a proprietor in its leasing of a bath house and bathing establishment, and answerable in negligence; and in the subsequent case of Martin v. Asbury Park, 114 N.J. L. 298, 176 A. 172, (E. & A.1935), a supplementary proceeding where satisfaction of the judgment obtained in the foregoing case was sought, by execution against the leased bath house, and was denied. The court held that even though in the prior case there was a proprietary use, the land in question was devoted to a "public purpose" and therefore not subject to execution.[24]

23. Vide: Cloyes v. Delaware Twp., op. cite: McCabe v. Highway Auth. op. cite; Gerr v. Emrick and Penna. Turnpike Comm., 283 F.2d 293, (3 Cir. 1960); e. g., the borrowing of funds, the issuance of bonds, operation of sewerage disposal plants, or water supply, highway authorities, turnpike commissions, condemnation proceedings, participation in federal loans and grants of funds for redevelopment or urban renewal, road improvements, soil erosion, etc.

24. It should be noted, that the Court although citing Bisbing as authority for immunity, did not defeat the concept of divisible municipal capacity, governmental-proprietary, under the statute requiring public purpose of the lands in question. Therefore, neither it, nor Bisbing, stands for the proposition that "park lands" are *ipso esse* governmental function. To like effect: Baird v. Ed. of Recreation Commissioners, Village of South Orange, 108 N.J.Eq. 91, 154 A. 204 (Chanc.Ch.1931), reversed on other grounds, 110 N.J.Eq. 603, 160 A. 537, (E. & A.1932).

Additionally, it is significant that enabling legislation in 1894, permitting cities bordering on the Atlantic Ocean to "open and lay out a public park or place for public resort or recreation on and along the beach or ocean front of such city" etc., and under which defendant acted, pertains to lands for dedication for public purposes, albeit, for multiple or disjunctive uses by such municipal corporations. Furthermore, mere characterization by a municipal corporation of a permissive public purpose does not determine and classify its particular use in negligence law.

As was so aptly stated in Weeks, 62 N.J.Super. 166, 183, 162 A.2d 314, 323–324:

"It is not unreasonable so to construe the statute here in question as to hold a municipality for negligence in the maintenance of [land] devoted to the performance of a function voluntarily assumed under its general powers or by permissive legislation, or where it performs a service which could be provided as well (and often is) by a private corporation, or where the function is allocated to the municipality for its profit or special advantage, rather than for the purpose of carrying out the public functions of the state without special advantage to the city." [brackets supplied].

It is also urged that the Court erred in denying certain requests to charge made by defendant, Atlantic City, which had for their purpose the declaration of its immunity. Consistent with the Court's rulings on prior motions, these requests were denied.

The additional requests to charge were covered generally in the charge of the Court, and were for that reason denied;[25] or they had no foundation in the evidence, such as actuarial formulae or arithmetical computations,[26] and were covered generally in broad terms of "present value"; or did, in the Court's opinion, constitute prejudicial error as with the requested instruction regarding the absence of income tax assessment on any damage award made by verdict;[27] or lacked the citation of any reliable supporting authority, and the clarity of law and preciseness of language to which the Court was entitled.[28] Those requests of the codefendant, Warren, which defendant, Atlantic City, orally adopted by way of reference as its own, were for the reasons expressed to the codefendant, as well as the reasons set forth above, likewise denied.

The remaining thrust of the defendant's motion is that the jury's verdict for damages in the amount of $600,000.00 was "excessive," and a result of the "influence of passion, prejudice, mistake and sympathy." This Court is cognizant of its judicial responsibility where the amount of damages awarded by jury verdict is questioned; and it recognizes that, while the primary responsibility is that of the jury, it is not exclusively so, and the ultimate responsibility rests with the trial judge.[29] In this regard, certain cardinal features lighted the way for the jury in determining its award. On August 24, 1960, before the injury in this case, plaintiff was a young man, age 24 years, in good health, a bridegroom, gainfully employed as a high school mathematics teacher in Long Island, New York, and was further-

25. Gerhart v. Henry Disston & Sons, 290 F.2d 778 (3 Cir. 1961); Keyser v. Hitz, 133 U.S. 138, 10 S.Ct. 290, 33 L.Ed. 531 (1889).

26. See note 25, ante.

27. Altemus v. Penna. R. Co., D.C., 32 F.R.D. 7, Id., D.C., 210 F.Supp. 834 (D.C. Dela.1963); McWeeney v. New York, N. H. & H. R. Co., 282 F.2d 34 (2 Cir. 1960).

28. 28 U.S.C.A. Rule 51; U.S.Dist.Ct.Dist. of New Jersey, Local Rule 18; Cherry v. Stedman, 259 F.2d 774 (8 Cir. 1958); Alexander v. Kramer Bros. Freight Lines, Inc., 273 F.2d 373 (2 Cir. 1960).

29. Guerini Stone Co. v. P. J. Carlin Constr. Co., 240 U.S. 264, 36 S.Ct. 300, 60 L.Ed. 636 (1915); Dellaripa v. New York, N. H. & H. R. Co., 257 F.2d 733 (2 Cir. 1958).

ing his education towards a Master's degree in the Science of Mathematics leading, in the natural course of events in this technological Age, to greater proficiency, increased earning potential and capacity, with a reasonably probable richer and fuller life. Indeed, he was virtually on the threshold of life's grand experiences. These are the uncontradicted facts in evidence. Against such is contrasted the plaintiff after injury. He sustained severe, complete and permanent traumatic injuries of the spine and spinal cord, with resultant quadriplegia. He was hospitalized immediately in the Atlantic City hospital, where he remained for about 4 months, and thereafter was transported to the Rusk Institute of Rehabilitation, in New York, where for some 14 months he underwent extensive and arduous rehabilitative therapy. Then, as now, he is completely paralyzed from the neck down the trunk of the body including the upper and lower extremities; he has succeeded in developing some shoulder and wrist movement only. He is permanently confined to his bed or a wheel chair, and requires the assistance of a male nursing attendant to administer to his personal and private needs. Periodic check-ups, medical treatments and antibiotics have been prescribed as essential, for the balance of his life expectancy, approximately 43 years, which, according to the uncontradicted testimony of plaintiff's medical expert, was established medically to be the same as for any other young man of his age, providing he has the continuing benefit of the prescribed medical care. His injuries terminated his gainful employment. He was earning as a high school teacher $4,500.00 annually in the New York School System, and has a wage-loss to date of approximately $10,000.00. His medical bills to date approximate $23,964.71, and estimated further medical expenses are at least $1,500.00 annually. Further education, if not impossible, is at best highly improbable. These, then, are the uncontradicted facts in evidence. And it may well be noted, that in the presentations and arguments of all counsel in this case, they displayed commendable restraint, awareness of legal proprieties and utmost good taste. There was not the slightest nuance of passion or sympathy engendered by counsel.

There is nothing which would warrant, or should prompt, this Court to pretend to a wiser assessment of damages for the injuries to this particular individual, and substitute its judgment for that of the twelve jurors sworn, no less, to exercise their best judgment in the same cause. While precise formulae in the area of personal injury negligence law remain elusive and undevised, our jurisprudence demands that provision be made for fair, just and reasonable compensation. Clearly this is what the jury has endeavored to do; and it is this, nothing more or less, that this Court believes it has done. Furthermore, in the exercise of this Court's judicial discretion, it is its conviction that there was substantial basis in the evidence for the amount of damages awarded by the jury and that, under all the instant circumstances, the verdict represented fair, just and reasonable compensation.

In summary, it was the finding of this Court, at the conclusion of the testimony, that the defendant, Atlantic City, was engaged in a proprietary activity within the meaning of the substantive law of New Jersey, and, as such, chargeable in negligence if found guilty of wrongdoing, and the case was so submitted to the jury with appropriate instructions on negligence and nuisance as a specific refinement thereof. However, if governmental, then this case may very well be the one that the New Jersey Supreme Court was waiting for. This could very well be, as stated by Chief Justice Weintraub in Cloyes, 23 N.J. 324, 332, 129 A.2d 1, 5 (1957) "the case in which to consider whether to come to grips with the entire problem." In any event, assuming, but not conceding, that the operation of the public beach be construed governmental in capacity and function, it is the view of this Court

that the defense of immunity is still unavailable to the defendant because of its active wrongdoing.[30] There were here committed acts of commission and acts of omission—tantamount to commission—so overwhelmingly negligent that had a motion been made by the plaintiff for the direction of a verdict, this Court would have been hard-pressed to retreat from an obligation to grant it, and to submit to the jury for its determination, the sole issue of damages. In view thereof, it is now, after verdict, the conclusion of this Court that there was presented legally sufficient and factually ample evidence of Atlantic City's negligence. Here was a situation where an extremely perilous condition, without any warning whatsoever, was permitted to continue for an intolerable period of time, despite the reoccurrences of accidents almost daily, despite the admitted knowledge of and recognition of danger by numerous municipal employees and officials one of whom was the Director of Public Safety, the other charged with the care and maintenance of the beach, and despite countless recommendations— if not pleas—for the removal of these treacherous pipes. To sit idly by and countenance such known danger to the unsuspecting public, to fail to take reasonable measures to avoid disaster instead of temporizing with the situation,[31] is abundant proof of grossly negligent conduct. The verdict of the jury against the defendant, Atlantic City, was proper. Insofar as the propriety of the jury's verdict in favor of the defendant, Warren, the provision of a private hotel beach to its guests, knowledge of the hazardous pipes, and direction of the plaintiff by the hotel to a known place of peril, presented purely factual issues that were resolved by the jury in Warren's favor. There was substantial basis for such finding.[32]

For all these reasons, the motions of the defendant, Atlantic City, are denied, and the verdict of the jury as recorded shall remain undisturbed.

The appropriate order may be submitted.

30. See Zanca v. Conti, 73 N.J.Super. 23, 179 A.2d 129 (App.Div.1962).

31. See Zanca v. Conti, ante.

32. Aetna Cas. & Surety Co. v. Yeatts, op. cite; Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147 (1940).