ESTHER SCHWARTZ AND ARTHUR SCHWARTZ, PLAINTIFFS-APPELLANTS, v. BOROUGH OF STOCKTON, A NEW JERSEY MUNICIPAL CORPORATION, DEFENDANT-RESPONDENT.

Argued January 26, 1960—Decided April 5, 1960.

142

*Mr. Harry Krieger* argued the cause for plaintiffs-appellants.

*Mr. Samuel A. Larner* argued the cause for defendant-respondent (*Messrs. Budd, Larner and Kent,* attorneys).

The opinion of the court was delivered by

HALL, J. The pivotal question in this case is whether defendant is immune from liability for plaintiffs' claim for personal injuries and derivative damages, arising from a fall by Mrs. Schwartz in a particular part of the borough hall, by reason of *R. S.* 40:9–2:

"No municipality or county shall be liable for injury to the person from the use of any public grounds, buildings or structures, any law to the contrary notwithstanding."

The Law Division held that it is, granting defendant's motion for involuntary dismissal at the end of plaintiffs' case. Their appeal to the Appellate Division from the consequent judgment was certified on our own motion. *R. R.* 1:10–1(*a*).

The issue posed, and here it is strictly a legal one for court and not jury determination, is the applicability of the statute. This must be considered in the light of the factual setting and that setting is to be determined from the evidence viewed most favorably to plaintiffs. So viewed, we find this state of fact.

In August 1955 Stockton, a very small town situated on the bank of the Delaware River in Hunterdon County, had

a borough hall which had been erected by the municipality many years before. It was a two-story building with basement. The first floor was divided into two parts. One served as the meeting room of the Mayor and Council, the office of the Tax Collector and related governmental purposes. The other, with which we are concerned, was occupied by the local volunteer fire company as a fire house to garage its apparatus and perhaps occasionally for other activities of the organization. The second floor consisted of one large room used by various local groups and societies, including the fire company, for meetings, entertainments, card parties and the like. The testimony was that the building had been erected to serve these various uses.

The arrangement between the borough and the fire company, in existence over a considerable period of time, called, on the one hand, for the latter to pay the municipality $200 per year for the use of the garage to house the fire engine and the upstairs room for company meetings and functions, with the borough being obligated to provide heat, light, janitorial service and building repairs. This sum was paid by company check bearing the designation "rent". It was not clear whether this arrangement was represented by a written lease, but that is immaterial. On the other hand, the borough appropriated annually in its budget $200 as "contractual aid," paid to the fire company in return for the agreement to keep its apparatus in first-class condition at all times and to answer all fire calls. This understanding was reduced to writing, but again we believe that fact to be of no special significance.

About August 18, 1955 the area was visited by a severe hurricane which resulted a few days later in serious flood conditions. The Delaware overflowed its banks and the little community of Stockton, along with other towns in the valley, was almost inundated. Homes and other buildings were flooded to a considerable height and made uninhabitable. Household goods and clothing were lost or rendered unusable. The water was two feet deep in the

first floor of the borough hall and the cellar was completely full. The fire engine was moved from the building and after the flood subsided several days later the mud and slime on the garage floor were cleaned off (whether by municipal employees or fire company members does not appear). The flooding had caused the floor to "heave" in places, but everyone was too busy taking care of the emergency needs of the population to even think about repairing it.

Mrs. Schwartz, who lived in Flemington, the county seat, had been working in Stockton with relief and welfare organizations providing food and meals for the stricken residents. She observed that many people were in need of clothing. As the president of the women's auxiliary of a veterans' organization in Flemington, she brought about through it the collection of new and used clothing for distribution in Stockton. She communicated with the Mayor, who quickly accepted her offer of the clothing and told her to bring it to the then vacant fire house portion of the borough hall which he would make available for a distribution center. This was done and on August 29th while she was engaged in this worthy endeavor there, she stubbed her toe on a raised floor board (the permissible inference being that the defect had been caused by the flood waters) and suffered the unfortunate fall and injuries forming the basis of this suit.

Plaintiffs' position is that, by reason of the regular use by the fire company, which is characterized as an independent, private entity, under the rental arrangement, as well as the actual use at the time of the accident, the garage portion of the borough hall was employed in the exercise of a "proprietary" rather than a "governmental" function and so was not a "public building" within the meaning of the statute, and consequently there is no immunity. Plaintiffs further contend, of course, that if immunity does not apply, a *prima facie* case was made out sufficient to impose tort liability on a municipal corporation under common-law

tort concepts in that field. Conversely, if the borough is entitled to the benefit of the statute, it is clear plaintiffs have no cause of action.

The statute was enacted as *L.* 1933, *c.* 460, *p.* 1550, approved January 10, 1934. As adopted it applied to school districts as well as counties and municipalities. The *Revision of* 1937 divided the measure into two parts, one relating to school districts being included in the title "Education" (*R. S.* 18:5–30) and the other applying to municipalities and counties allocated to the title of that name (*R. S.* 40:9–2).

By 1934, the original broad concept of common-law governmental tort immunity in this State, enunciated by *Board of Chosen Freeholders of Sussex County v. Strader,* 18 *N. J. L.* 108 (*Sup. Ct.* 1840), had been judicially whittled down to this point: municipal activities were divided, very imprecisely and controversially, into two classes, governmental and proprietary. Where the tort occurred in connection with a proprietary function, liability was determined on ordinary principles of negligence without regard to the municipal character of the tortfeasor. *Martin v. Asbury Park,* 111 *N. J. L.* 364 (*E. & A.* 1933); *Olesiewicz v. Camden,* 100 *N. J. L.* 336 (*E. & A.* 1924). If the function was determined to be governmental, active wrongdoing had to be found, else there was no cause of action. *Casey v. Township of Bridgewater,* 107 *N. J. L.* 163 (*E. & A.* 1930). The rub had come in deciding what was governmental and what proprietary and what amounted to active wrongdoing. See *Weintraub and Conford, "Tort Liability of Municipalities in New Jersey,"* 3 *Mercer Beasley L. Rev.* 142 (1934).

Of course, the whittling process has progressed further since, by finding active wrongdoing in the governmental field from a negligent act of commission, by what might be said to be a more lenient attitude toward the proprietary classification, by assessing binding governmental action or inaction from the affirmative or negative conduct of officials

and employees less high on the municipal ladder, and by refusing to extend the doctrine to new situations. *Allas v. Borough of Rumson,* 115 *N. J. L.* 593 (*E. & A.* 1935); *Milstrey v. Hackensack,* 6 *N. J.* 400 (1951); *Kress v. City of Newark,* 8 *N. J.* 562 (1952); *Kelley v. Curtiss,* 29 *N. J. Super.* 291 (*App. Div.* 1954), reversed on other grounds 16 *N. J.* 265 (1954); *Taylor v. New Jersey Highway Authority,* 22 *N. J.* 454 (1956); *Cloyes v. Delaware Township,* 23 *N. J.* 324 (1957); *Hartman v. City of Brigantine,* 23 *N. J.* 530 (1957); *Farkas v. Middlesex Board of Freeholders,* 49 *N. J. Super.* 363 (*App. Div.* 1958); 12 *Rutgers L. Rev.* 179–191 (1957); 13 *ibid.* 53–57, 103–104 (1958). This New Jersey trend is in line with that being followed elsewhere. *Cloyes v. Delaware Township, supra; Prosser, Law of Torts* (2d ed. 1955) § 109, *pp.* 774–775; 2 *Harper and James, The Law of Torts* (1956) §§ 29.1, 29.2, 29.3, 29.5, 29.6.

█ It must be recognized, however, that here we are concerned with an explicit legislative declaration of public policy and not with a common-law principle. Our duty, therefore, in determining applicability in a particular situation, is to give effect to the statutory command to the full extent of the law-makers' intent as we ascertain it, regardless of any view of the social desirability of the legislation. *Thompson v. Board of Education, City of Millville,* 11 *N. J.* 207 (1953); *Egan v. Erie Railroad Co.,* 29 *N. J.* 243, 252 (1959). We cannot consider the question in the same way as we would one involving the judge-made doctrine of general municipal tort immunity.

Here it is plain we have the reverse of liberalization in the limited area covered. (The validity of the statute on the score of selective classification or otherwise is not raised.) The contrast with enactments extending or implementing governmental liability is striking. See statutes collected in *Cloyes* (23 *N. J.,* at *pages* 331–332). The title designates the measure as "An Act *establishing the non-liability* of counties, municipalities and school districts by reason of

injury to the person from the use of any public grounds or buildings." (Emphasis added throughout.) In the body, the declaration is that there shall be no liability, *"any law to the contrary notwithstanding."* The introductory statement appended to the bill recites that "[t]he design * * * is *to clarify the existing law as to the non-liability* of counties, municipalities and school districts * * *." Use of the verb "clarify" might at first blush suggest the aim to be a mere holding of the line at the then level of judicial decision in the covered phase of the field, but this view seems unsound in the light of the title and of the absolute prohibition that "[n]o county, municipality, or school district shall be liable for" personal injuries in the specified circumstances, "any law to the contrary notwithstanding." A turning back of the clock in this rather narrow sphere seems definitely indicated, perhaps, however, with "an implicit approval of the judicial trend manifested beyond the immediate area of the statute." *Cloyes, supra* (23 *N. J.,* at *p.* 331).

There can be no doubt the statute must apply if the activity or function being carried on is governmental. Such was the express holding in *Thompson v. Board of Education, City of Millville, supra* (11 *N. J.* 207), the only case in which the measure has been directly considered by our highest court. See also *Terranella v. Union Building and Construction Co.,* 3 *N. J.* 443, 447 (1950). In *Thompson* the contention was rejected that the statutory immunity was not intended to, or should not, apply where active wrongdoing was alleged as the cause of injuries sustained while attending an extra-curricular school event, which, in an earlier phase of the litigation (12 *N. J. Super.* 92 (*Cty. Ct.* 1951)), had been held to be a governmental and not a proprietary activity. Since we are convinced that here the relationship between the borough and the fire company belongs in the governmental classification, the building involved is a "public" one within the intendment of the statute. We are also of the opinion that immunity thereby

granted was not divested by reason of the nature of the temporary use of the garage portion at the time of the accident. So we do not reach or pass upon plaintiffs' contention that the act does not apply where the function carried on is proprietary. *Cf. Leeds v. Atlantic City,* 13 *N. J. Misc.* 868 (*Cir. Ct.* 1935); see also *Falcone v. Board of Education of Newark,* 17 *N. J. Misc.* 75, 77 (*C. P.* 1939).

■ There is general uniformity throughout the country that fire protection, including the operation and maintenance of fire apparatus and the construction and management of fire houses and other fire-fighting facilities, is a governmental function as far as tort liability is concerned. *Rhyne, Municipal Law* (1957) 734, 782; 2 *Harper and James, The Law of Torts* (1956), § 29.6, *pp.* 1623–1624. *Cf. Florio v. Jersey City,* 101 *N. J. L.* 535 (*E. & A.* 1925); *Wild v. Paterson,* 47 *N. J. L.* 406 (*Sup. Ct.* 1885). See *Cloyes v. Delaware Township,* 41 *N. J. Super.* 27, 34 (*App. Div.* 1956), affirmed 23 *N. J.* 324 (1957). While this might be thought of as relating primarily to municipally organized, paid fire departments, we are of the opinion that the principle necessarily extends to municipal arrangements with volunteer companies such as here, insofar as use of municipal structures and claims for personal injuries arising therefrom is concerned. *Cf. Wild v. Paterson, supra* (47 *N. J. L.,* at *p.* 412).

■ As Murray Seasongood said in his article, *"Municipal Corporations: Objections to the Government or Proprietary Test,"* 22 *Va. L. R.* 910, 914–915 (1936) (quoted in 2 *Harper and James, op. cit.,* § 29.6, *n.* 22): "It is not a hundred years since fire companies were generally private and voluntary." And they still are, to a certain degree, in the rural areas and smaller communities of our State. It is only the larger and more densely settled centers that can afford or have the need for a full-time complement of fire-fighters, compensated and supplied entirely at municipal expense. But the need for some fire protection exists everywhere and the volunteer company supplies that need where

a municipal department is not feasible. While such organizations are independent, incorporated as associations not for pecuniary profit (*R. S.* 15:8–1 *et seq.*), and frequently supply their own buildings and apparatus, they may, and generally do, have definite relationships with municipal governing bodies, at least through annual appropriations to them for equipment and maintenance, thereby giving them a kind of semi-official status. This relationship is particularly spelled out in the township law (*R. S.* 40:149–4 to 15, inc.), whereby the township committee is empowered, among other things, to contract financially with volunteer companies "for the purpose of extinguishing fires," the company to be under township supervision and control and "considered as doing public fire duty." *R. S.* 40:149–8. While the borough law, pertinent here, does not contain the same detailed provisions, it does expressly authorize the annual appropriation of sizeable sums of money to aid borough volunteer fire companies or those in adjoining municipalities habitually responding to fires therein and to pay for group life and other insurance for the benefit of company members. *R. S.* 40:47–27 and 28, as amended. *L.* 1945, *c.* 47 (*N. J. S. A.* 40:47–30.1 and 30.2). We have no doubt a borough has the same right as a township to make its annual appropriation on a contractual basis, as Stockton did here, despite the absence of express statutory authority, either by virtue of the broad general powers delegated to all municipalities to enact measures necessary and proper for the preservation of the public safety and welfare (*R. S.* 40:48–2) or by implication from the express power to appropriate moneys in aid of the fire company. *Cf. Green v. City of Cape May,* 41 *N. J. L.* 45 (*Sup. Ct.* 1879).

■ Moreover, the Workmen's Compensation Law covers volunteer firemen doing public fire duty (*N. J. S. A.* 34:15–43) and each governing body is required to procure insurance to assure payment of such benefits (*N. J. S. A.* 34:15–74). *Cf. Brower v. Township of Franklin,* 119 *N. J. L.* 417 (*Sup. Ct.* 1938), decided before section 43

was amended to its present broad form. Of special significance is the legislative declaration in *section* 43 that "[e]very active volunteer fireman *shall be deemed to be doing public fire duty under the control or supervision of any * * * governing body * * ** within the meaning of this section * * * if the fire company of which he is a member receives contributions from, or a substantial part of its expenses or equipment are paid for by, the municipality * * *.*" (Emphasis added) It is, therefore, clear that Stockton's annual "contractual aid" payment to the fire company is actually carrying on a governmental activity or function by an authorized method rather than a proprietary arrangement.

Nor do we believe the rental to the company of part of the borough hall, unquestionably basically a "public building," converts the relationship into a proprietary one and so renders that part of the structure not a "public" one within the fair meaning of the immunity statute. We have said that financial aid to a volunteer fire company amounts to exercise of a governmental function. It seems equally clear that providing a place in the borough hall to house the apparatus should be similarly classified, forgetting for the moment that rent was charged equal to the aid given. All municipalities are empowered to erect and maintain buildings necessary for the transaction of public business, "or for any other municipal use or public purpose," *N. J. S. A.* 40:60–6. For the reasons previously given, housing the fire engine of the volunteer fire company is a public purpose (compare the express grant to townships of power so to do. *R. S.* 40:149–4). *Cf. Cordingly v. Borough of Mendham,* 12 *N. J. Misc.* 331, 332 (*Sup. Ct.* 1934). This being so, impliedly a governing body could make a portion of the borough hall available to the fire company for that purpose either for full rent, nominal consideration or without charge. In fact, our statutes so provide. *R. S.* 40:88–11 and *N. J. S. A.* 40:60–45.4 (*L.* 1954, *c.* 184). The references therein to the right to lease where the property or portion of it is

"not needed for borough purposes" or "not required for municipal purposes" must be read to mean "not needed for functions administered by the municipality itself." Obviously when the building was constructed and designed in part for fire apparatus garage use, that portion was not needed for such other purposes. While Stockton chose to charge more than a nominal rental, as the Legislature gave it the right to do, it must be remembered that the charge also covered use of the upstairs room for social and other activities customary with small town fire companies but not truly part of their public duties. We fail to see how this rental arrangement with a fire company can possibly be said to work a transformation of what is otherwise a public building and the exercise of a governmental function. We are not concerned here with the applicability of immunity where a municipality leases all or any part of its unneeded lands or buildings for a purely private or commercial purpose (see *e. g. R. S.* 40:60–42) and so express no opinion thereon.

 There remains the question whether the particular use at the time of this accident makes any difference. Plaintiffs suggest the distribution of relief clothing amounted to no more than non-governmental social services rendered unofficially by private persons. Assuming solely for discussion purposes that this is a correct characterization, we do not think it divested immunity otherwise applicable. The statute does not qualify the word "use" by the adjective "public." We believe it clearly within the legislative intent and sound to say, for purposes of this case, that a building, basically "public" as is a borough hall, remains such at least when the injuries are sustained in connection with an occasional private use, either expressly authorized by law or for community advantage, where the arrangement for such use is not for the pecuniary profit of the municipal owner. The assumed situation is comparable to that in *Kane v. Board of Education of Montclair,* 20 *N. J. Misc.* 7 (*Sup. Ct.* 1941), where the statute was held applicable to

immunize liability for injuries sustained on the outside steps of a school building by a patron of a theatrical performance staged in the auditorium therein by a private organization to whom the room had been rented by the board of education pursuant to general statutory authority. See *R. S.* 18:5–22. We are not required here to consider the question whether immunity exists with respect to injuries sustained in that portion of an otherwise "public" building in which proprietary activities are habitually carried on. *Cf. Doerr v. Newark,* 128 *N. J. L.* 491 (*Sup. Ct.* 1942).

The judgment is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.