Joseph W. WILLIAMS, Olivia Jones, John W. Battiste, William Pittman, Jr., Russell Johnson and Cleamon Waddel Cephas, Jr., on Behalf of themselves and all others similarly situated

v.

RESCUE FIRE COMPANY, Inc., a Maryland Corporation and Mayor and City Commissioners of Cambridge, Maryland, a Municipal Corporation of the State of Maryland.

Civ. A. No. 16658.

United States District Court
D. Maryland.

May 12, 1966.

Marvin Braiterman and Elsbeth Levy Bothe, Baltimore, Md., for plaintiffs.

Charles E. Edmondson, Cambridge, Md., Richard W. Case, Joseph M. Roulhac, Smith, Somerville & Case, Baltimore, Md., for defendant, Rescue Fire Co., Inc.

Charles Awdry Thompson, Cambridge, Md., for The Commissioners of Cambridge.

John Doar, Asst. Atty. Gen., David L. Norman, Peter S. Smith, Attys., Dept. of Justice, on brief, for United States as amicus curiae.

NORTHROP, District Judge.

This class action is brought by Negro citizens of Cambridge, Maryland, to enjoin the segregation of an arena and a swimming pool in that city. The plaintiffs were denied the use of the arena and swimming pool, refused to leave the admission area, were arrested for trespassing, and presently are free on bond, awaiting trial pending this decision. Relief is sought under the Fourteenth Amendment and the implementing legislation of the Civil Rights Act of 1964.

Plaintiffs place their main reliance upon Subchapter II of the 1964 Act, 42 U. S.C. § 2000a.[1] The 1964 Act prohibits discrimination or segregation of public accommodations if such discrimination affects commerce, or, as contended here, if such discrimination or segregation is supported by state action. Plaintiffs seek an order enjoining the owner and operators of the arena and pool from continuing their discrimination and enjoining the Mayor and Commissioners of the City of Cambridge from assisting (through its police or other agencies) the owners and operators in their discriminatory practices. The plaintiffs also seek reasonable attorneys' fees.

The owner and operators of the facilities in question, the Rescue Fire Company, Inc. (RFC), contend that the operations of the arena and pool are not "tainted" by state action and that the RFC Arena-Pool Club is a private club and therefore exempt under section 2000a (e) of the 1964 Act. The Mayor and City Commissioners of Cambridge defend on the basis that they have nothing to do with the arena or pool or, indeed, with any non-firefighting activity of RFC.

The United States, as requested, has submitted a brief as amicus curiae.

The court concludes that the plaintiffs have established the facts set forth below.[2]

1. The relevant portions of section 2000a are as follows:

"(a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

"(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

\* \* \* \* \*

"(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

"(4) any establishment (A) (i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

\* \* \* \* \*

"(d) Discrimination or segregation by an establishment is supported by State action within the meaning of this subchapter if such discrimination or segregation (1) is carried on under color of any law, statute, ordinance, or regulation; or (2) is carried on under color of any custom or usage required or enforced by officials of the State or political subdivision thereof; or (3) is required by action of the State or political subdivision thereof.

"(e) The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section."

2. Many of the facts have been stipulated by the parties. In the many instances where facts were not stipulated, the court has resolved the conflicts in the testimony. The court's findings and the stipulations appear together below.

RFC is a nonprofit corporation organized in 1882 and incorporated under the laws of Maryland in 1885. It has existed continually from that time as the fire department for the City of Cambridge and for the portion of Dorchester County close to that city.

RFC has three classes of members: active, exempt, and honorary. The "active" members, restricted by RFC's constitution to seventy-five in number, are those who actually fight fires. The "exempt" members are those who have been active members for at least ten years. "Honorary" members, who can neither vote nor hold office, number around four hundred and are, in effect, contributing sponsors; they pay annual dues of six dollars.

All members are entitled to the use of the facilities of the RFC including the facilities at the firehouse owned by the City of Cambridge. There are no restrictions as to the residence of honorary members, but active members must live either in the City of Cambridge or near enough to be available to answer fire alarms.

Active members pay no dues and are the *only* class allowed to vote, to hold office, and to elect to membership all classes of members. They elect the president (who appoints the various committees), the vice-president, the secretary, and the treasurer of the RFC. The active members also elect the fire chief and two assistant fire chiefs. Although elected by the active members, the officers of the fire department must be "*approved by* the Commissioners [of Cambridge]." [3]

The fire chief and his assistants are under the direction of the Mayor and Commissioners. All active firemen are bound by the ordinances of the City as set out in Chapter 13, Section 13.01–13.17 inclusive (Plaintiffs' Exhibit 55). These provisions give the chief complete control during a fire call; grant firemen police powers, including the right to inspect commercial premises and the power of arrest; and prescribe penalties for persons posing as firemen.[4] The substance of these ordinances is embodied in RFC's rules, which also contain numerous regulations pertaining to the operation of RFC. Thus, the ordinances of Cambridge and the regulations and bylaws of RFC prescribe the conduct of RFC.

State statute provides for the granting of pensions to widows of firefighters killed while fighting fires.[5] Scholarships are also provided for children of volunteer firemen kiled in the line of duty.[6] The real and personal property of fire companies, including RFC, is specifically exempted from State taxation.[7] Also, volunteer fire departments are exempt from payment of any state amusement and sales taxes.[8]

Defendants do not deny that, with respect to firefighting, RFC is an agency of the City, and that the City, County, and RFC act in concert in firefighting activities. Cambridge owns nearly all of the firefighting equipment used by RFC, the exception being RFC's ownership of a one-half interest in a tank truck (used primarily in fighting fires in Dorchester County). Firefighting apparatus is housed in the City Hall of Cambridge, which is owned by the City. The second floor of the City Hall is set aside for the use of RFC members of all classes and their guests. This floor includes a meeting room, a reading lounge, a poolroom, a television room, a kitchen and dining area, and rooms used as offices and classrooms. RFC regulations govern the use of these facilities and refer to the recreation rooms as "club rooms."

3. Ord. § 13.02. (Emphasis added.)

4. An ordinance even provides for the assessment of fines against those with suspended or revoked memberships who act as firemen. (Ord. § 13.04)

5. Md.Code Ann. art. 88A, § 41 (1964 Replacement Volume).

6. Md.Code Ann. art. 88A, § 43 (1964 Replacement Volume).

7. Md.Code Ann. art. 81, § 9(2) (1965 Replacement Volume).

8. Md.Code Ann. art. 81, §§ 326(v), 405 (1965 Replacement Volume).

The Cambridge budget shows a total annual allotment for RFC of approximately $22,000 for salaries, operating expenses, and capital outlays. Salaries total $7,725: the chief receives $100; each of the two assistants receives $50; a mechanic is paid $4,600; a custodian is paid $2,925. Operating expenses, including gas and oil, telephone, fire insurance, liability insurance ($675), and repairs, total $10,225. Capital outlays vary, but in 1964 and 1965 they amounted to about $3,700.

The City also gives RFC $750 annually, which is placed in RFC's general funds. (RFC claims that this sum is used to cover the cost of insurance for the ambulance operator and for the firemen.) Additionally, the City makes an annual donation for the RFC children's Christmas party.

For its firefighting activities in that portion of Dorchester County around Cambridge, RFC receives $2,000 annually from the County. This payment is made pursuant to an act of the Maryland legislature.[9]

The above-mentioned annual appropriations from the City and the County are placed into one RFC general bank account. The appropriations constitute about twenty-five percent of RFC's annual budget.

The volunteer firemen have rendered this state a great service and have supplied leadership to their community and state outside the sphere of firefighting. In the spring of 1952, as an extension of their community interest, the active members of RFC decided to erect an arena, or, as it was then commonly referred to, a "community building." The then-president of RFC (who now is the mayor of Cambridge and who has held other RFC offices) appointed Mr. Brice G. Kinnamon as chairman of a committee to proceed with arrangements for the "community building." (This small committee later became the Arena-Pool Committee when RFC undertook construction of what is advertised as "the largest pool in the East.") The members of the RFC negotiated with the Commissioners of Cambridge and arranged for the donation by the City of about an acre of land. The City had purchased the land from private individuals for a price of $4,000. Contemporaneously with the gift, the parties agreed that if RFC ever sold this property it would pay the City the sum of $4,000. Subsequently RFC purchased and was given additional parcels of land. The parcel given by the City is approximately one-seventh of the entire tract.

The RFC then arranged with Dorchester County for the County to fill in and grade the newly-acquired land. The County also donated the use of its bulldozers and cranes when needed and, in addition, furnished prison labor on one occasion. RFC later reimbursed the County for the cost of this labor.

RFC made at least three interest-free loans from its funds to the Arena-Pool Committee. (All such loans were repaid.) Additional funds required for the construction of the arena and pool were borrowed from Cambridge banks. The total cost of the arena and pool construction was $265,000. (Approximately $34,000 remains unpaid.) When the pool loan was negotiated, the total acreage at the location was appraised at $25,000.

The City gave $3,000 to the arena construction fund. The defendants claim, however, that RFC decided that for one year it would use its own members for custodial services at its headquarters in City Hall and that the $3,000 represented money that would have otherwise been given by the City for these services; thus, RFC claims a quid pro quo for the $3,000.

The arena was opened in 1955 and the pool in the summer of 1958.[10] Until 1962, people were admitted to the facili-

9. Acts of 1941, ch. 461.

10. Both the arena and the pool have a snack bar which is manned by RFC members, even when the arena is leased to other groups. The profits from these snack bars are deposited in the arena-pool account.
The plaintiffs do not urge that this amount of connection with interstate

ties upon paying the price of admission for roller skating or swimming. The facilities were open to the public, except that Negroes were excluded. Indeed, the RFC minutes clearly reflect that all persons admitted to the facilities or to whom the facilities would be rented were to be white. It further appears that no Negro entertainers were to be admitted.

In September of 1962, the RFC Arena-Pool Club was formed to help solve, as contended by RFC and the City, problems that had arisen in maintaining order at the facilities. There is little, if any, evidence of any incidents or trouble to support this contention. The decision to form the club, however, was made in an atmosphere of impending racial disturbance.

In effecting this change, the RFC added the name "Club" but continued operations much as before. Additionally, in order to appear as though it were a club, certain other changes were made. Annual dues for "club members" were fixed at twenty-five cents and membership cards were issued.[11] Since September of 1962, in order to gain admission to either the arena or the pool, a person must display a current membership card and then pay an admission price (not significantly changed from the pre-club days).

Acceptance into club membership requires submission of a formal application carrying both the recommendation of a member in good standing and the approval by two members of the Arena-Pool Committee. A member may bring as many guests as he desires, paying only the standard skate or swim charge for the privilege. After acceptance the members pay annual dues of twenty-five cents. The seventy-five active members of RFC, although they must be members of the Club to use the facilities, receive free memberships and are entitled to reduced seasonal rates at the facilities for themselves and their families.

Membership in the Club is not restricted to residents of the City of Cambridge, and the RFC testimony is that approximately twenty-five percent of the membership is from outside of the City. All members may bring guests to the facilities. RFC's records indicate that for the 1965 season, 2,323 applications for membership were received, all but four of which where correctly filled out. The records also indicate that there were 2,327 members in 1965. (The discrepancy possibly may be explained by the loss of some application forms.)

While no formal records of membership applications or cards were kept prior to the 1965 season, membership dues and receipts indicate that for the years of 1963 and 1964 there were some 3,800 members. A comparison of this figure to the 1965 season indicates a drop in membership. The income from skating, skate rentals, and swimming fees has increased from previous years, showing *use* much over and above the membership of 2,327.

Most of the 2,327 members are under eighteen years of age. The stipulation as to 1965 indicates that 1,694 were under eighteen. Since twenty-five percent of the membership is reported to live outside of Cambridge, approximately 1,270 members in 1965 were residents of the City and under eighteen. According to the 1960 census, this figure represents three-fourths of the entire white population of Cambridge within that age bracket.[12] No members of any class of RFC

commerce brings the facilities within the coverage of the Fourteenth Amendment and the Civil Rights Act of 1964; they do, however, contend that this activity is further evidence of a public accommodation invested with state action. For that reason the court admitted the evidence as to these activities.

11. At the present time, the Company has in its possession 2,327 such cards; the cards contain the name and address of each member and indicate that the 1965 dues have been paid.

12. The 1960 federal census figures show a total population of 12,239 for Cambridge. Statistics also indicate a population growth from 1950 to 1960 of only 303, the other increase of 1,585 over the 1950 census of 10,351 having come through annexation. So, use of the

are Negroes. (There is a dispute as to whether a Negro has actually applied for active membership, but it is clear that none would be accepted.)

Although the Committee may refuse to extend membership to those it terms "undesirable," there have been very few occasions where persons have been denied membership on this ground.[13] The fact that in 1965 there were 2,323 applications and 2,327 members indicates that there were no rejected applicants.

The only type of rejection that occurred is that which gives rise to this action. On July 4, 1965, a small group of Negro and white youths, including the plaintiffs, sought admission to the RFC swimming pool. The cashier gave one of the Negro youths an admission ticket which was hastily taken from him by a pool attendant. He and the other Negro youths were prevented from entering and from securing membership applications; they were rejected before they applied.

Some consideration has been given to Negroes, however. The arena has been rented on occasion to outside groups. Prior to the Civil Rights Act of 1964, it had been the policy of the Committee to require any groups or persons renting the arena to admit white persons only, including entertainers. But, since 1964, there has been a relaxation of this rule.

In summary, the facilities, the membership,[14] and all of the policies of the Club are controlled by a small committee of the RFC which is appointed by and reports to the active members of the RFC. The Club "members" merely have the right of admission upon paying the scheduled fees (which are many times the annual "dues") and to bring admission-paying guests. The Committee is the same committee that operated the public arena and pool before it became "The RFC Arena-Pool Club." There is little difference between the manner of operation now and that prior to August of 1962, when the decision was made to operate on a "club" basis.

Donations by the City and County to the arena construction amounted to thirteen-and-a-half percent of the cost of construction. This figure is based on a construction cost of $96,000, a County contribution of $6,000, a City contribution of $3,000, and a value of $4,000 for the land given to the City. Additionally, the filling, leveling, and other work done by the County, at no charge to RFC, was of some value. Thus, for the arena construction, state participation clearly was more than de minimis.

There were no direct monetary contributions from the County and City for the pool construction. Again, however, the County assisted with the filling, leveling, and excavation.

For the pool construction the RFC made at least one interest-free loan to the Committee. It also made land purchases for the pool site and placed the blanket mortgage on the pool and arena sites. Money was advanced on RFC credit, and individual donations for the project were accepted by RFC.

There is no dispute that RFC is the official and only fire department of Cambridge and of a portion of Dorchester County. This is established by RFC's manner of operation, by City ownership of the headquarters and fire equipment, by court decisions, by state statute, and by local ordinance. Cf. Rescue Fire Co. of Cambridge v. County Commissioners of Dorchester County, 188 Md. 354, 52 A.2d 733 (1947); Md. Code Ann. art. 81, §§ 9(2), 280(q), 326 (v), 405(a), (1957 ed., 1965 Replacement Volume); Md.Code Ann. art. 88A, §§ 40–

---

1960 census in testing the membership of the Club is found to be a valid one. Approximately one-third of the total population of Cambridge is Negro.

13. Certain persons have had their membership suspended or withdrawn because of their activities or behavior at the fa-
cilities. Suspension or expulsion results only after action of the entire Committee.

14. There appears to have been no direct mail communication with the membership, although there have been occasional notices to the members in the local paper.

44 (1957 ed., 1964 Replacement Volume). The Company belongs to the public or governmental branch of the municipality. RFC's status as a city agency is not affected by the fact that it is in large measure composed of non-salaried firemen. Cf. Schwartz v. Borough of Stockton, 32 N.J. 141, 160 A.2d 1 (1960); Sikora v. Steinberg, 40 Misc.2d 649, 243 N.Y.S.2d 766 (Sup.Ct.1963).

■ RFC and the City urge that the Club facilities are entirely private, that the Club is divorced from the RFC, and that the Club activities are in no way impregnated with State action. These contentions cannot stand. The "club" or "social" activity is inextricably integrated with RFC's responsibilities to the community as The Fire Department of Cambridge.

The court is aware that the taint of state action may be eliminated. See, e. g., Tonkins v. City of Greensboro, 276 F.2d 890 (4th Cir. 1960), where a bona fide public auction of a municipal pool to a private individual, in the face of demands for the end of segregation, was held to have insulated from subsequent challenge the segregated operation of that pool. Here, however, the Club is not insulated from the State's involvement with RFC.

RFC must pay the City $4,000 if the arena land is ever sold. RFC claims, though, that since there is no reverter clause in the land given by the City, its situation must be distinguished from Hampton v. City of Jacksonville, 304 F. 2d 320 (5th Cir. 1962). In *Hampton*, the city sold two municipal golf courses after a court decision sustained challenges to discrimination at the courses; the deeds contained reverter clauses which had the effect of assuring that the two properties would be used only as golf courses. The Fifth Circuit held that the presence of a reverter clause constituted sufficient power or control of the city over the operation of the courses to make the owners state agents within the purview of the Fourteenth Amendment. Again, in Eaton v. Grubbs, 329 F.2d 710 (4th Cir. 1964), the presence of a reverter clause was relied upon by the court in finding state action.

There are differences between a reverter clause and an agreement such as the one involved here. However, RFC's agreement to reimburse the city for the cost of the land in the event of its sale is one factor that the court has considered in finding state action.

Section 13.02 of the Cambridge ordinances provides for approval by the Commissioners of the officers elected by the active members of RFC. Approval has never been withheld. This relationship is similar to that existing between the North Carolina Dental Society and the North Carolina legislature, as described in Hawkins v. North Carolina Dental Society, 355 F.2d 718 (4th Cir. 1966). There the court found state action present where the Society excluded Negro dentists. The "tie in" with the state was the power of the Society to influence the selection of the state Board of Dental Examiners. (The earlier statutory power of the Society to actually select the members was withdrawn by the state legislature, but the court found that the Society's voice influenced the selection even in the absence of explicit statutory authority.) In the instant case, the same active members who choose public officials—the fire chief and his assistants—from their number are able to elect and control, solely because of their status as active firemen, the Committee which supervises membership and other activities of the Arena-Pool Club. Defendants urge, however, that the members are acting in different capacities in electing their chief and electing their Committee. Were the men to "wear different hats" in their different capacities, each hat would contain the insignia of the Rescue Fire Company. The arena and pool activities are tied in too closely with the civic activities of RFC for the state involvement with the one to be isolated from the other.

Defendants also point out that no RFC general funds are now used for the arena-pool operations. However, none are necessary in that the facilities are now self-

supporting. The court concludes from the present self-sufficiency that the City and the County gave the then-"public" arena and pool such impetus that financial independence was close at hand. This success does not obscure the fact that the City and State governments, through their agents—the active members—initiated the projects.

A city agency—RFC—owns, operates, and controls, through the Committee, a segregated "public" facility. Exemption from state, county, and city taxes extends to the arena and pool properties. This establishes state action. When a fire department, in its official name, using taxpayers' land and taxpayers' money in small or large part, constructs, controls, and operates a tax-exempt recreation facility, in effect open to the public, it cannot exclude one-third of those taxpayers for "social" reasons. Discrimination under these circumstances falls squarely within the prohibitions of the Fourteenth Amendment and the Civil Rights Act of 1964. Especially is this so when the obvious purpose of the tax exemptions extended to the facilities of this non-profit organization is to permit all proceeds from fund-raising projects and enterprises to be used, undiminished, for the purpose of sharpening the efficiency of the members in firefighting and of purchasing equipment for a fire department.[15]

Nor can the owner of the facilities merely add the word "Club" to escape application of the law. In essence, nothing more than a name change was attempted here. One day patrons went to "The RFC Arena-Pool," which was open to all but Negroes; the next day these same patrons went to "The RFC Arena-Pool Club," which was open to members only. The nominal twenty-five cent annual membership fee and the unchanged daily or seasonal rates at the facilities indicate little change in the operations.

The so-called "club" operation is an obvious subterfuge. See Lackey v. Sacoolas, 411 Pa. 235, 191 A.2d 395 (1963); Brackeen v. Ruhlman, 3 Race Rel.L.Rep. 45 (1957); Gillespie v. Lake Shore Golf Club, Inc., 91 N.E.2d 290 (Ohio App.1950); In Re Holiday Sands, Inc., 9 Race Rel.L.Rep. 2025 (1964). Here, however, even the guise of a lease or transfer is lacking.

The defendants can find no comfort in the fact that their club or facility is a non-profit one. The courts will not enjoin discrimination motivated by profit and then allow discrimination "for charity."

The arena and pool continue to operate, as originally intended, as public facilities of the City of Cambridge.[16] The decision here does not depart from the position taken in 1960 in Jones v. Marva Theatres, Inc., 180 F.Supp. 49 (D.Md.1960). It is unnecessary to engage further in "sifting facts and weighing circumstances," Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961), as the involvement of the state is obvious.

This court concludes that the club facilities, owned, operated, and controlled by the Rescue Fire Company, Inc., are public accommodations and that segregation of these facilities has been supported by state action in violation of the rights given by the Fourteenth Amendment and by the Civil Rights Act of 1964. Therefore, the relief sought by the plaintiffs will be granted against all defendants.

The court shall retain jurisdiction to determine the question of attorneys' fees after a hearing as provided in 42 U.S.C. § 2000a–3(b).

The foregoing constitutes the court's findings of fact and conclusions of law. Counsel will promptly submit the appropriate orders.

---

15. This follows if the exemption is to bear a reasonable relationship to the good of the community. Cf. Williams v. Mayor and City Council of Baltimore, 289 U.S. 36, 41, 53 S.Ct. 431, 433, 77 L.Ed. 1015 (1933).

16. The supplement to the 1959 City Director tor carries a picture of the arena under the heading, "Civic Institutions." The caption "Arena in City Building" appears below the picture.