586 A.2d 346

WILSON COALITION, AN UNINCORPORATED TAXPAYERS AS-
SOCIATION AND JOHN SALINGER, PLAINTIFFS, v. MAYOR
AND COMMON COUNCIL OF THE CITY OF SUMMIT, DEFEN-
DANTS.

Superior Court of New Jersey
Law Division Union County

November 29, 1990.

*Herbert A. Vogel* for plaintiffs (*Vogel, Chait, Schwartz & Collins,* attorneys).

*William B. Butler* for defendants (*Hooley, Butler, DiFrancesco & Kelly,* attorneys).

BEGLIN, A.J.S.C.

This is a case of first impression, concerning the ability of a municipality to acquire property and simultaneously lease it to nonprofit community agencies.

In 1957, the City of Summit purchased a four and one-half-acre tract of land adjoining an 11-acre city park. The agreement of purchase recognized the city's need to build a new school on a portion of the site and "its future municipal needs for the remainder of the premises." The property was then conveyed to the board of education, which constructed a one-story 38,000-square foot building used continuously thereafter as the Robert Cade Wilson Elementary School. The property is located in an area zoned for low-density, single-family residences and is adjoined by a neighborhood of large, well-maintained homes. Summit itself is a six-square mile city with a population of 21,071, fully developed with the great majority of its area devoted to owner-occupied residences. In 1981, it enjoyed the highest per capita income of all municipalities in Union County.[1]

In 1980, having determined to close the Wilson School, as it was not needed for school purposes, the board of education moved its administrative offices into the building. The following year the board obtained variance approvals for the Summit Child Care Center, the Y.W.C.A., the Historical Society and the United Way to occupy the vacant portions of the building as tenants on an interim basis. In 1984, the board leased those

---

[1] Union County Division of Planning and Development, *Data Book* (Aug. 1988).

areas to those agencies for an additional three-year period, and the temporary variances were eventually extended through 1988. In granting the variances, the board of adjustment, pursuant to *N.J.S.A.* 40:55D–2 and –70d, found that such uses would "promote the public health, safety, morals and general welfare."

In July 1986, the Summit Space Use Committee issued its interim report recommending to the board of education that the school property be transferred to the city for residential development. Over the next two years, the subject was regularly discussed by the common council, which conducted one or more feasibility studies concerning possible municipal uses and considered various other arrangements. During those two years, the future of the building was discussed at regular council meetings and at a special meeting called for that purpose, as well as at separate public meetings conducted in the summer of 1988. By then, the board of education had formally determined that the property was no longer needed for school purposes (see *N.J.S.A.* 18A:20–5).

Eventually, a majority of the council decided to accept the proffered deed from the board of education and to utilize the land and buildings as a "community resource center," immediately arranging to lease the building to the Summit Child Care Center, the Summit Y.W.C.A. and the Summit Area Association for Gerontological Endeavors (S.A.G.E.). The authorizing ordinance was adopted February 21, 1989, and the deed accepted March 22, 1989. Sixteen days later, this action challenging that ordinance was commenced.

After extensive negotiations which preceded as well as followed the acquisition decision, council introduced an ordinance on July 18, 1989 to enter into leases with these three agencies for ten-year terms at a beginning collective annual rental of $78,000. Those ordinances were finally adopted on September 8, 1989. It is understood that plaintiffs challenge the leasing ordinances as well.

In the ordinance accepting the property, the council found there to be

> several municipal purposes for which the land and building can be used ... the primary (one being) ... to convert same into a community resource building and in turn to lease the premises to nonprofit corporations providing services which will promote the health, safety, morals and general welfare of the citizens of Summit ... and if for any reason (it cannot be used) for the primary purpose of acceptance ... that there are other municipal uses and purposes for which (it) can be adapted to serve.

In this regard, "nonprofit" means the corporation was found to be exempt from federal income taxes under § 501(c)(3) of the Internal Revenue Code as an entity organized and operated exclusively for charitable or educational purposes; and that it was incorporated under the predecessor statute (*N.J.S.A.* 15:1–1 *et seq.*) to the present New Jersey Nonprofit Corporation Act of 1983, meaning it was organized not for pecuniary profit but *inter alia* for charitable, benevolent, eleemosynary, educational, civil, social and/or athletic purposes. Each of the agencies involved here is so qualified.

The Summit Child Care Center, Inc., incorporated in 1955, is licensed by the New Jersey Department of Human Services pursuant to *N.J.S.A.* 30:5B–1 *et seq.* In section 2 of that act, the Legislature found that

> it is in the public interest to license and regulate child care programs and facilities in order to insure the continuous growth and development of children. The Legislature further finds that comprehensive child care programs are of value to the health, safety, education, physical and intellectual growth and general well-being of the children served and that the programs strengthen and supplement the family unit. The Legislature further finds that child care programs provide places for preventive health measures, early detection of illnesses and handicaps and development of special talents and interests. The Legislature further finds the State and parents have a responsibility in the education of children and that the role of the teacher is essential to the continuous development of children. The Legislature further finds that experience indicates that the development of child care centers should be encouraged, whether publicly or privately supported, to provide a full range of services benefiting the child, parent and community and that there is a great need for expansion of existing centers and for the establishment of additional centers.

The lease approved by the city stipulates that no more than 165 children are to be enrolled in its programs on any single day. Partial- or full-day care is also provided at the center. In that

regard, see *Three L Corp. v. Newark Board of Adjustment,* 118 *N.J.Super.* 453, 288 *A.*2d 312 (Law Div.1972), where the court observed:

> Private day care centers should be treated as community facilities rather than arbitrarily classified as proprietary uses, and should be considered as being comparable to elementary or public nursery schools for purposes of zoning. The very nature of the use, *i.e.,* educational, gives rise to special reasons pursuant to *Kohl v. Mayor, etc., Fair Lawn, supra,* 50 *N.J.* [268] 279 [234 *A.*2d 385 (1967)]. Additionally, day care center services meet community objectives in much the same manner as other more familiar community institutions such as schools and public nurseries, even though the State did not see fit to make nursery level compulsory. A private nursery school serves, in addition to the educational function, an important social community purpose for mothers. Public nursery schools can be established by a board of education in any school under its control, pursuant to *N.J.S.A.* 18A:44-1. If a public facility is not provided in the district, the availability of a local private nursery serves a legitimate education need, sanctioned, though not required, by the State. [at 459, 288 *A.*2d 312]

The Y.W.C.A. of Summit, New Jersey, incorporated prior to 1953, presently operates from a large building on Morris Avenue. Its use of the Wilson School gymnasium allows it to conduct a gymnastics program consisting of both recreational instruction and formal competitions. It is contemplated most participants will be driven to the school from the Morris Avenue building, the lease stipulating no more than 150 are to be enrolled in the program on a given day.

S.A.G.E. was incorporated in 1954 to provide a variety of services to the elderly population and their families. At the school, it conducts a day care program which includes elder care counseling and care for those suffering from Alzeheimer's disease. The school also houses its administrative offices, from which it operates a meals on wheels program (the food being prepared elsewhere), home health care and paratransit programs. Enrollment in these programs is limited by a specified maximum number of daily round-trips.

Council President Brown testified to the need in present society for the types of services these agencies offer and how it was consistent with the "character" of Summit to provide these

services, if possible, utilizing volunteers instead of the government.

The subsequently adopted ordinances approving leasing of the property to the three agencies each recite findings that "the property and capital improvements thereof are no longer needed for public use" and "the public purposes to be served by the leasee is the promotion of the health, safety, morals and general welfare of the community" through the provision of:

1. recreational services benefiting approximately 1750 persons directly and their families indirectly (Y.W.C.A.),

2. support to the elderly living in the Summit area by offering a variety of services that foster independence, benefiting approximately 1900 elderly persons directly plus their families indirectly (S.A.G.E.), and

3. development of early childhood education and care, including administrative services for approximately 325 children who will receive direct benefit and their families indirectly (Summit Child Care Center).

Plaintiff coalition is a group of concerned citizens, many of whom reside in the neighborhood immediately surrounding the Wilson School. They contend that the sole purpose of the city in acquiring the property was to lease it immediately to the three agencies and that such violates the governing statutory scheme.

In acquiring real property, a municipality is governed by § 3 of the Local Lands and Buildings Law, *N.J.S.A.* 40A:12–1 *et seq.*, which in pertinent part provides:

(a) Any county or municipality may acquire, construct and maintain such buildings or other capital improvements as may be necessary and suitable for the performance of its functions, the accommodation of the courts required to be held in the county or municipality, the conduct of public business and the use of the county and municipal departments, officers, boards, commissions and agencies in charge of institutions and facilities and any other county or municipal public purposes, and from time to time as necessary, repair, alter, enlarge, rebuild, furnish, refurnish, or rehabilitate such buildings. [*N.J.S.A.* 40A:12–3]

A reading of the statute suggests that acquisition of a building must be found to be "necessary and suitable" for the municipality to: (1) perform its functions, (2) accommodate its municipal court, (3) conduct public business, and be used by

municipal departments, *etc.*, or (4) perform any other public purposes.

Plaintiffs urge that the statute only permits acquisition of property when it is necessary to perform the traditional governmental functions of the municipality. Clearly, housing courts, governmental departments, agencies and boards certainly would fulfill the purposes of local government, furthering its ability to conduct public business. The statute, however, should not be read in such a restricted fashion, because property may also be acquired for "other ... municipal public purposes." The use of this phrase demonstrates a legislative intent to include, beyond traditional governmental functions, those activities which can fairly be characterized as furthering a public purpose. The phrase acquires meaning by reference to its history and background, plus analysis of comparable statutory provisions and case law in other areas.

The predecessor to the present statute authorized municipalities to acquire "such buildings as may be necessary or suitable for the transaction of public business, or for any other municipal use or public purpose." *N.J.S.A.* 40:60–6. It appears this language was employed because of the distinction between governmental and proprietary functions recognized by the common law of tort liability. References appearing in *R.S.* 40:88–11 and *N.J.S.A.* 40:60–45.4 to the right to lease when property "is 'not needed for borough purposes' or 'not required for municipal purposes' must be read to mean 'not needed for functions administered by the municipality itself.'" *Schwartz v. Stockton*, 32 *N.J.* 141, 153, 160 *A.*2d 1 (1960).

In recognizing that certain functions are classified as proprietary when voluntarily undertaken pursuant to general governmental powers or permissive statutes, or when they represent a service which could also be provided by a private corporation, the Appellate Division said:

> The operation of a swimming pool is an activity which a municipality provides for its citizens more as a matter of local convenience than in the exercise of some duty discharged on behalf of the State with consequent benefits accruing

to the State as a whole ... The statute (authorizing a municipality to operate a swimming pool) is permissive, adding to the broad range of activities which a municipality may undertake in meeting the needs and desires of its residents ... (T)he statute ... does not thereby transmute that activity into a governmental function ... (A) swimming pool 'is not within the imperative public duties imposed on a municipality as agent of the State' ... Our Supreme Court has recognized that in recent times municipalities ... have expanded into many new areas, either replacing private enterprise or satisfying new needs which theretofore had not required public activity. [*Weeks v. Newark*, 62 *N.J.Super.*, 166, 180–182, 162 *A.*2d 314 (App.Div.1960), aff'd o.b. 34 *N.J.* 250, 168 *A.*2d 11 (1961)]

On the other hand, a governmental function was the type of activity historically engaged in by local government or mandated by the State to be performed by the municipality, "a function ordinarily and naturally attributed to government." *Stringfield v. Hackensack*, 68 *N.J.Super.* 38, 45, 171 *A.*2d 361 (App. Div.1961). The criteria of *N.J.S.A.* 40A:12–3(a) that property being acquired be necessary and suitable for the performance of the *functions* of municipal government or for any other public *purposes* is further recognition of this distinction. Both the historic, traditional, governmental functions and the more general, expanding, proprietary activities of a municipality constitute proper uses of public property, and each are accordingly recognized by the acquisition statute.

The particular property in question here is an elementary school. It is helpful therefore to refer to certain analagous provisions of the education law.

A board of education is authorized to acquire property for "school purposes" (*N.J.S.A.* 18A:20–2) and may thereafter dispose of those lands "which cease to be suitable or convenient for the use for which they were acquired or which are no longer needed for school purposes" (*N.J.S.A.* 18A:20–5), through private sale when conveying to a political subdivision of the State (*N.J.S.A.* 18A:20–6).

Should a board "determine that any tract of land is no longer desirable or necessary for school purposes," it is authorized to convey the property for a nominal consideration not only to the municipality, but

> to any volunteer fire company or rescue squad ... or to any American Legion post, Veterans of Foreign Wars, or other recognized veterans' organization ..., or to a nonprofit child care service organization ..., or to a nonprofit hospital ..., or to a nonprofit organization duly licensed ... to provide emergency shelter for the homeless. [*N.J.S.A.* 18A:20–9]

The board may in its discretion when so conveying property to the municipality or other organization impose a condition that it be used by the municipality or organization "for public purposes" or revert to the board. *Ibid.* In addition,

> (w)henever any board of education shall by resolution determine that any tract of land, whether there is a building thereon or not, or part or all of a school building, is not necessary for school purposes, but which it does not desire to dispose of for reason that the property may, at some future time, again be required for school purposes, it may authorize the lease thereof for a term extending beyond the official life of the board ...
>
> (If) the same is leased to the federal government, State, a political subdivision thereof, another school district, any board, body or commission of a municipality within the school district, any volunteer fire company or rescue squad actively engaged in the protection of life and property and duly incorporated under the laws of the State of New Jersey, or to any American Legion post, Veterans of Foreign Wars, or other recognized veterans' organization of the United States of America, located in the municipality or the county, as a meeting place for such organization, or to a nonprofit child care service organization duly incorporated under the laws of the State of New Jersey, or to a nonprofit hospital duly licensed under the laws of the State of New Jersey, or to a nonprofit organization duly licensed under the laws of the State of New Jersey to provide emergency shelter for the homeless, or to a nonprofit senior citizen organization, in which case the same may be leased by private agreement for a nominal fee without advertisement for bids. [*N.J.S.A.* 18A:20–8.2a]

From these statutes, it is readily seen that, whenever property is no longer needed for school purposes, it may either be leased or sold by the board of education for a nominal consideration not only to the municipality or another unit of government, but also to a variety of nonprofit organizations which are deemed to provide services of benefit to the public. The focus of the legislative scheme is upon the nature of the organization and the type of public service it performs, and it is implicit in these provisions that the lease or conveyance, whether to a public or a private entity, furthers a public purpose. The ability, then, of a municipality to acquire property formerly used as a school, and the use to which it may then put that

property, should be considered with this in mind. Certainly "any other municipal public purposes" as used in *N.J.S.A.* 40A:12–3(a) might well recognize those publicly related purposes authorized for unneeded school property by the education law. See the discussion of public purpose in a somewhat analagous situation in *Hill v. Summit,* 64 *N.J.Super.* 522, 166 *A.*2d 610 (Law Div.1960).

> The concept of public purpose is a broad one. Generally speaking, it connotes an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government. Moreover, it cannot be static in its implications. To be serviceable it must expand when necessary to encompass changing public needs of a modern dynamic society. Thus it is incapable of exact or perduring definition. In each instance where the test is to be applied the decision must be reached with reference to the object sought to be accomplished and to the degree and manner in which the object affects the public welfare. [*Roe v. Kervick,* 42 *N.J.* 191, 207, 199 *A.*2d 834 (1964) (quoted with approval in *Mt. Laurel Tp. v. Public Advocate of N.J.,* 83 *N.J.* 522, 534, 416 *A.*2d 886 (1980))]

Clearly, accepting the property as the ordinance stated, to convert it into a community resource building, would further a public purpose. Plaintiffs urge, however, and the court finds, that the building was acquired so that it could be leased immediately to the three selected agencies. The ordinance itself reflects that fact as well. In other words, at that time the city had no other use in mind when it made reference to a community resource building. Does such mean that no municipal public purpose is present here?

Each of the three agencies is well established in the Summit area, has successfully conducted its activities for some time on a nonprofit basis, and is organized and operated for charitable, educational or civic purposes. For the significance of the distinction between organizations required by their charters and law to operate in a nonprofit manner, and those which are not so limited, see *Princeton Tp. v. Bardin,* 147 *N.J.Super.* 557, 563–564, 371 *A.*2d 776 (App.Div.1977), certif. den. 74 *N.J.* 281, 377 *A.*2d 685 (1977). In its ordinances, the common council found that each would serve a public purpose by its recreational

programs, its services to the elderly, and its early childhood education and day care facilities.

■ Each agency provides a benefit to the public. Their programs, activities and services conducted in the building advance purposes generally beneficial to the community as a whole. The leases authorized by the ordinances control those activities so that for practical purposes their conduct will not differ significantly from how similar activities would function if sponsored and run by the city itself. Moreover, each agency has demonstrated that there is a need in the community for the services it is providing, and local government itself could certainly within its powers establish similar child care and instruction, recreational and elderly related programs. The character and conduct of the usage each agency will make of the Wilson School has been so defined and circumscribed in the ordinances and leases that it can be concluded such in effect represents a proprietary function of local government. That being so, and the community as a whole benefiting therefrom, municipal public purposes have been furthered by the city acquiring the school in the manner and for the reasons it did. When used in this fashion, the building in fact becomes a community resource center.

This is not to say that a municipality has unbridled power to acquire property simply for the purpose of leasing it to a nonprofit agency. But here, the property acquired had been used as a public building for over 20 years, the board of education could itself have sold or leased it to these agencies. The functions each will perform in the building further purposes which are now accepted as part of what modern day government recognizes and sponsors. The public will benefit from those activities and the leases have confined and controlled the use of the property. The public purposes being furthered are not fundamentally altered because they are conducted by private agencies. Indeed, in remanding a matter for the development of a full record, the Supreme Court recently

noted that "the acquisition of land to facilitate the operation of a supermarket is not a traditional governmental function. Yet, there may be ways to justify this kind of government involvement or subsidy." *Davidson Bros., Inc. v. D. Katz & Sons, Inc.*, 121 *N.J.* 196, 218, 579 *A.*2d 288 (1990). *See also N.J. Housing & Mortgage Fin. Agency v. Moses*, 215 *N.J.Super.* 318, 324, 326, 521 *A.*2d 1307 (App.Div.1987).

Beyond what has been said, further statutory provisions reinforce the conclusion reached. *N.J.S.A.* 40A:12–5(b) allows a municipality, having acquired property which has then become "unsuited or inconvenient for the use for which it was acquired," to convert some or all of it to any other public use. *N.J.S.A.* 40A:12–14(c) authorizes a municipality to lease any real property not needed for public use to a nonprofit corporation or association for a public purpose, which may be for a nominal consideration. These statutes further demonstrate that public use and public purpose are two different concepts, reinforcing the court's analysis of the difference between governmental "functions" and "other municipal public purposes" as those terms are employed in *N.J.S.A.* 40A:12–3(a). Further, in reciting the many and varied purposes for which leases for a public purpose may be made, *N.J.S.A.* 40A:12–15(i) specifically includes "(a)ny activity for the promotion of the health, safety, morals and general welfare of the community of any nonprofit corporation or association."

The city urges that section 15(i) defines the public purposes encompassed by section 3(a). The two sections, however, should not be used interchangeably. Section 3(a), in speaking of the acquisition of the property, requires that property be found necessary and suitable for one or more public purposes of the municipality. Here, the governing body found that the Wilson School, no longer needed for school purposes, *was* needed to fulfill the particular purposes achieved through the programs and activities sponsored by the three agencies. Council decided to keep the building rather than have it demolished ("stockpiling" was the word used by the council president)

so that it would not be lost for possible future public use, that its type and location presented a resource to the community other than as a school or building housing government offices. That is, it could be utilized for a variety of public purposes presently and in the future. Suitability had been shown by the use to which it had been put by the Board of Education over the years since the school closed. That being so, section 3(a) was satisfied and the city authorized to take title from the Board of Education.

Before it could lease the building to the agencies, it was also necessary for the city to satisfy section 14(c) by finding that it was not needed for public use. This section suggests the traditional functions of local government, much as the initial phrase in section 3(c) authorizing the acquisition of property. Here, use by various city departments and agencies was considered, but each had been rejected for various reasons. The work of the Community Development Area Planning Committee in 1986 eventually resulted in decisions to relocate the Police Department and expanded City Hall facilities in the central business district. Council was therefore justified ultimately in concluding that the building was not needed for a public use or some governmental function. It was then authorized to enter into the subject leases, and to have those leases fulfill the purposes set forth by section 15(i).

The overall statutory scheme demonstrates that section 3(c) does not limit the municipality's ability to acquire property to what it needs to devote to public use or to perform its traditional governmental functions. It may also acquire property which it finds suitable and necessary for the accomplishment of other public purposes; and if that property is not then needed for traditional governmental use, it may lease it to achieve those public purposes, and such a lease may be with nonprofit organizations of the type involved here.

For the foregoing reasons, all other issues having been addressed in a bench opinion, judgment will be entered in favor

of defendants, dismissing the amended complaint with prejudice.